# EXHIBIT A

## AFFIDAVIT OF LINDA GREEN

**STATE OF ALABAMA**   )
                                 )
**MADISON COUNTY**      )

Before me, a notary public in and for said state and county, personally appeared Linda Green, after being first duly sworn, deposes and says as follows:

1.     My name is Linda Green. I am a resident of Alabama. I am currently employed as Executive Vice President of the Wealth Management division of Colonial Bank, N.A. and, in such capacity, file this Affidavit in support of Colonial's motion seeking summary judgment in the lawsuit filed by Kitty Graham, a former Platform Annuity Agent Trainer employed in the Family Insurance section of Colonial's Wealth Management division.

2.     I am authorized to make this affidavit, and I am competent to testify at trial regarding the statements made in this affidavit.

3.     Colonial Bank, N.A. ("Colonial") is a National Association with its principal place of business located in Montgomery, Alabama and within the jurisdiction of the United States District Court for the Middle District of Alabama. Colonial offers a broad line of retail and commercial banking products and services including checking and savings accounts, personal and commercial loans, online banking, credit card and merchant services, as well as treasury management, investment services and private banking and trust services. Colonial employs over 4,000 employees among its more than 300 banking offices in Florida, Alabama, Georgia, Nevada and Texas. Through its Wealth Management division, Colonial's wholly-owned subsidiaries, which include Colonial Investment Services, Inc. and Colonial Investment Services of Florida, Georgia, Nevada and Tennessee, offer insurance products and fixed annuities for sale to the public. These subsidiaries are regulated by each state's department of

1

insurance. Colonial Brokerage, Inc. offers investment services, *e.g.*, stocks, bonds, mutual funds and variable annuities and is regulated by the NASD.

4.    At the time of the events alleged in her Complaint, Ms. Kitty Graham worked as one of two Platform Annuity Agent Trainers ("Trainer") in the Family Insurance section of Colonial's Wealth Management division. Ms. Graham held that position from August 12, 2003 until Colonial eliminated the position on January 18, 2005, as part of a comprehensive restructuring of the Wealth Management division.

5.    As a Trainer, Ms. Graham was charged with providing product and sales training and support to Licensed Bankers within her assigned geographic territory (principally Alabama, Georgia, and Florida) regarding the sale of fixed-rate annuities and insurance products (life and long-term care products). She was also charged with providing a tracking program to monitor the success of Licensed Bankers in their efforts to sell fixed annuity and insurance products. As set forth in her job description, Ms. Graham, as a Platform Annuity Trainer, ultimately was responsible for increasing gross sales and fee income in the Platform Annuity Program. A true and correct copy of the job description for the Regional Platform Annuity Trainer is attached hereto as Attachment No. 1.

6.    In January 2005, Colonial eliminated several positions within the Wealth Management division, including the two Trainer positions, as part of the first phase of a comprehensive restructuring of the division. Although Colonial offered Ms. Graham a severance package, including 160 hours severance pay, as well as the opportunity to reapply for other positions within Colonial, she rejected both and has not reapplied for another position within Colonial.

7.     Historically, Colonial has offered its customers a wide array of investment products and services through its Wealth Management division, including fixed and variable annuities, insurance, stocks, bonds, mutual funds, etc.  Prior to 2005, Colonial offered these investment products to its customers principally through two separate sections.  The Family Insurance section was responsible primarily for the marketing and sale of fixed annuities and insurance products (life and long-term care products) through approximately 350 Licensed Bankers.  The Family Insurance section provided sales training and product support to the Licensed Bankers *viá* the two Trainers -- Kitty Graham and Terri Meeves.  Ms. Graham served in that position until Colonial eliminated her position in January 2005.  Although the Trainers and Licensed Bankers were required by law to hold a state insurance license to sell those products and services, they were not required to hold NASD licenses and, in fact, did not provide any training to Colonial's Financial Consultants regarding NASD licensed products to Colonial employees, *e.g.*, stocks, bonds, mutual funds and variable annuities.

8.     The Product Management section was responsible for product and sales training for approximately 30 NASD licensed Financial Consultants, *i.e.*, brokers, who, in turn, marketed and sold NASD licensed products to Colonial customers.  Colonial assigned a sales territory to each Financial Consultant that included designated Colonial branch banks.  Both the Financial Consultant and the branch banks generated customer referrals.

9.     In mid-2004, as a result of concerns regarding the productivity and profitability of its Wealth Management division, the Wealth Management division began undertaking the lengthy and comprehensive process of restructuring the division for the purpose of increasing revenue and profitability.  In furtherance of that effort, Colonial promoted me (then age 53) in May 2004 to the position of Executive Vice President of the division.  In September 2004, I

began to actively explore engaging the Huntington Investment Company ("Huntington") to serve as an outside consultant for a three-year period to review the structure of the division and to provide advice and recommendations for improving performance and overall profitability of the division. Huntington is a comparably sized financial institution and an established consultant for banks. I ultimately selected Huntington as Colonial's consultant because of its similarity in number of branches and deposit size, and because of its reputation in successfully generating investment revenue.

10.    As a part of the review process, Huntington, in conjunction with the Wealth Management division, began analyzing Colonial's investment and insurance program by comparing certain categories of its performance to industry performance benchmarks. In particular, they examined deposit sales penetration, deposit revenue penetration, annual sales production and annual revenue production for NASD licensed Financial Consultants as well as Licensed Bankers (insurance license only). The results of that analysis were disturbing. Huntington found that the Wealth Management division significantly underperformed the industry average in each category, including the revenue and profitability of its Fixed Annuity Platform. The following chart reflects the results of Colonial's analysis:

| DEPOSIT SALES PENETRATION[1] | |
|---|---|
| Colonial | 2.2% |
| Industry Average | 3.4% |
| Top Quartile | 4.6% |
| Huntington | 6.4% |
| DEPOSIT REVENUE PENETRATION[2] | |
| Colonial | $1,107 |
| Industry Average | $1,901 |
| Top Quartile | $2,491 |
| Huntington | $3,360 |

---

[1]  This category reflects the sales (dollars invested) of mutual funds and annuities and life insurance premiums, all divided by the bank's retail deposits.
[2]  This category represents the Investment program revenue divided by the bank's retail deposits (divided by a million).

| ANNUAL REVENUE PRODUCTION[3] | |
|---|---|
| Colonial | $10,561 |
| Industry Average | $19,287 |
| Top Quartile | $24,295 |
| Huntington | $36,679 |
| ANNUAL SALES PRODUCTION[4] | |
| Colonial | $357,217 |
| Industry Average | $428,600 |
| Top Quartile | $539,889 |
| Huntington | $815,088 |

11.    Additionally, the Wealth Management division did not meet its internal goals. Revenues for four of the five sections of the division decreased in 2004, and none of the five sections met their budgeted goals.

| Financial Planning Service | 2003 Actual | 2004 Budget | 2004 Actual |
|---|---|---|---|
| Colonial Asset Management | $    140,000 | $    358,000 | $      72,000 |
| Trust | $ 2,187,700 | $ 2,000,000 | $ 1,428,000 |
| Investments/Discount Brokerage | $ 5,703,200 | $ 6,223,300 | $ 5,293,000 |
| Fixed Annuity Platform Program | $ 6,093,800 | $ 6,833,300 | $ 5,545,600 |
| Insurance Sales | $    990,600 | $ 1,757,731 | $ 1,031,400 |
| TOTAL | $15,115,300 | $17,172,331 | $13,370,000 |

12.    A more detailed examination of Fixed Annuity revenues likewise revealed that the Fixed Annuity sales for 2004 in Alabama and Florida were well below the established goal and, in fact, had substantially decreased from the preceding year.

| FIXED ANNUITY REVENUES | | | |
|---|---|---|---|
| STATE | 2003 Actual | 2004 Budget | 2004 Actual |
| Alabama | $3,179,539 | $3,416,550 | $2,765,699 |
| Florida | $1,985,000 | $2,451,000 | $2,053,000 |

13.    The individual performance of Licensed Bankers, for whom Kitty Graham was responsible in part as one of the two Trainers, was equally poor.  Only 48 of the 325 Licensed Bankers met their 2003 sales goal, and 116 sold no Family Insurance products, i.e., insurance or

---

[3]  This category represents the average revenue derived from Licensed Platform Banker sales.
[4]  This category represents average revenue produced by NASD licensed representatives.

fixed annuities. Furthermore, although the number of Licensed Bankers increased to 354 in 2004, only 45 met their 2004 goals, and 103 sold no Family Insurance products.

| LICENSED BANKER PERFORMANCE | | | |
|---|---|---|---|
| **2003** | | | |
| **Total Number Licensed Bankers** | **Total Licensed Bankers Making Goal** | **Total Licensed Bankers With No Sales** | **Total Licensed Bankers With Sales Over $1 Million** |
| 325 | 48 | 116 | 23 |
| **2004** | | | |
| 354 | 45 | 103 | 24 |

In sum, the overall performance of the Wealth Management division, including the revenues generated by Ms. Graham's area of fixed annuities and insurance, reflected a poorly performing division in need of a top-to-bottom restructuring.

14. Based on its poor performance, I asked Huntington to prepare a restructuring plan for the Wealth Management division. The restructuring plan was not directed at the elimination of any particular position or employee, but rather, it focused on the development of concrete goals and recommendations directed at improving performance and increasing profitability of the division.

15. During the Fall of 2004, in consultation with Colonial, Huntington developed a series of goals and strategies for the Wealth Management division designed to improve its performance with the ultimate goal of achieving performance in the top quartile of the industry. In addition to the structural changes that ultimately resulted in the elimination of Kitty Graham's position, Colonial implemented a comprehensive plan to achieve the new goals established for the division. The ultimate restructuring, which remains ongoing, included, *inter alia*, the following reforms:

- Elimination of unnecessary positions through consolidation of positions and duties;

- Restructuring of broker compensation models to provide consistency in pay and foster teamwork between Licensed Bankers and Financial Consultants;

- Implementation of Huntington Team Leader model;

- Establishment of monthly executive summary reporting – sales, operation, compliance;

- Evaluation of vendors/products to establish Preferred Product list;

- Renegotiation of selling agreements with major vendors to improve terms;

- Reorganization and upgrading product and sales training curriculum and quality of training and support provided to Financial Consultants and Licensed Bankers;

- Implementation of on-line trading;

- Creation of a Sales Desk to serve as an immediate resource for Licensed Bankers in all 300-plus Colonial branches;

- Revision of Financial Consultant employment agreements;

- Reduction of office space from three floors to one floor;

- Updating of supervisory procedures;

- Updating Compliance Manual and Business Continuity Plan;

- Creation of a partnership with UVEST Financial Services to provide clearance, settlement and custody services for Colonial customers; and

- Implementation of a rewards/incentive plan for Licensed Bankers and Financial Consultants.

In sum, the elimination of positions through the organizational restructuring of the Wealth Management division was only a small part of the comprehensive reforms Colonial implemented and which Colonial continues to implement today.

16.    One immediate challenge Huntington and Colonial recognized was the fact that the existing structure of the division impeded communication and cooperation among its five sections and, in particular, between Licensed Bankers who sold fixed annuities and insurance products under the Family Insurance section, and Financial Consultants who, operating under the Product Management section, sold NASD licensed products, *e.g.*, stocks, bonds, mutual funds and variable annuities. Although part of the same division, the Family Insurance section and the Product Management section were essentially operating independently of one another and often were competing directly for the same banking customer. Furthermore, there was little in the way of cooperative effort between the sections of the division and Colonial's retail and commercial banking partners. Consequently, Colonial concluded that the organizational structure of the division presented a significant impediment to the goal of increasing and deepening customer relationships and to the ultimate goal of increasing productivity and profitability.

17.    To address some of these systemic problems, and specifically to promote greater communication and collaboration among the division's various sections, Huntington recommended adoption of a hybrid investment model known as the Team Delivery model. In contrast to the existing structure, which essentially forced each section of the Wealth Management division to fend for itself, the Team Delivery model was designed to provide a greater focus on the delivery of investment services to customers based on their specific investment needs through the united and cooperative effort of Licensed Bankers, Financial Consultants, retail and commercial banking partners, support staff and product specialists. In other words, under the Team Delivery model, the entire apparatus of the division, in conjunction with the complete apparatus of Colonial Bank, would work to create and to further customer

relationships and to support and to deliver a total banking solution for customers based on a personalized financial strategy.

18.    Implementation of the Team Delivery model directly and significantly affected the Family Insurance and Product Management sections, as well as the existing positions in those sections. In particular, as previously stated, prior to the implementation of the Team Delivery model in early 2005, the division employed two separate sections to market and sell traditional investments products and services to customers. The Family Insurance section was responsible for selling fixed annuities and insurance products through Licensed Bankers. Susan Guy was the Family Insurance Manager, and she directed and supervised Kitty Graham and Terri Meeves, who were the Trainers responsible for providing sales training and product support to the Licensed Bankers with respect to insurance and fixed annuity products. However, Ms. Graham, Ms. Guy and Ms. Meeves had no duties or responsibilities regarding the marketing and sale of NASD licensed products, nor could they perform such duties without the necessary NASD licenses. In contrast, the Product Management section was responsible for providing sales training and product support for Colonial's NASD licensed Financial Consultants (brokers) who, in turn, marketed and sold traditional investment and brokerage services, *e.g.*, stocks, bonds, mutual funds and variable annuities.

19.    As part of the transition to the Team Delivery model recommended by Huntington, the division chose to eliminate the Family Insurance and Product Management sections and to consolidate the functions of the two sections into a single section. As part of that consolidation, I made the decision to eliminate several positions, including the position of Family Insurance Manager, formerly held by Susan Guy, the two Platform Annuity Agent Trainer positions, formerly held by Kitty Graham and Terri Meeves, and the Product

Management position, formerly held by Ann Fuller. In turn, the division created several new positions which consolidated the functions of the former Family Insurance and Product Management sections. Under the new structure, the division would market all of its investment products within a single section. The division also created the new position of Program Director to oversee the sales training of Licensed Bankers and NASD licensed Financial Consultants, and it created two Regional Sales and Development Wholesaler positions ("Wholesalers") to train both Licensed Bankers selling fixed annuities and insurance products and Financial Consultants selling NASD licensed investment products. In other words, there would now be a single section responsible for all investment products.

20.    I recommended the elimination of Kitty Graham's position based on my good-faith business judgment that the organizational restructuring of its Wealth Management division, in conjunction with many other changes implemented by the Wealth Management division, would best further the goals of increasing efficiency, revenues and profitability. That business judgment was not merely the product of a whim or a reshuffling of the organizational chart, but rather, it was the direct result of a lengthy and introspective process undertaken by the Wealth Management division in conjunction with Huntington, a well-respected and independent banking consultant. At no time did I or anyone else who participated in the restructuring process consider the age or sex of any employee in eliminating positions during the organizational restructuring.

21.    On January 18, 2005, I, along with Tara Gibson, the Human Resources Area Manager for Colonial's Montgomery Bancgroup, met with Kitty Graham in Colonial's Montgomery corporate offices. I informed Ms. Graham that Colonial was eliminating her position as part of the organizational restructuring of the Wealth Management division, and I thanked her for her service to Colonial. At no time during the meeting did Ms. Graham ever

inquire about the availability of another position within the Wealth Management division or within Colonial Bank. Furthermore, when Tara Gibson reviewed the terms of the proposed separation agreement with Ms. Graham, she informed her that she had the right to reapply for another open position within the company. I also informed Ms. Graham that if she successfully reapplied for another position, her termination pursuant to the elimination of her Trainer position would not be treated by Colonial as a break in service. Although Colonial offered Ms. Graham a severance package, including 160 hours severance pay, as well as the opportunity to reapply for other positions within Colonial, she rejected both and has not reapplied for another position within Colonial.

22.     I have reviewed Ms. Graham's Complaint. Although she alleges that Colonial only eliminated positions of women over the age of 40 during the reorganization, her allegation is incorrect. In particular, the elimination of the initial four positions held by Graham, Susan Guy, Terri Meeves and Ann Fuller was only a small portion of the total number of positions eliminated during the organizational restructuring of the Wealth Management division. Over the course of the reorganization, the division eliminated 29 positions. Six of those positions were held by male employees; 21 of those positions were held by employees under the age of 40; and 17 of those 21 positions were held by employees under the age of 30. Additionally, the positions eliminated were not limited to the Family Insurance section, but rather extended to virtually every section of the Wealth Management Division, including Operations, Compliance, Program Area and Trust. A true and correct list of the positions eliminated pursuant to the reorganization of the Wealth Management division is attached hereto as Attachment No. 2.

23.     In sum, the elimination of Kitty Graham's Trainer position in the Wealth Management division was not part of a concerted effort to rid the division of older female

employees. Rather, the elimination of her position was part of a comprehensive organizational restructuring which included the elimination of over two dozen positions within various sections of the Wealth Management division; positions that were held by men and women of diverse age groups. Furthermore, of the 29 positions eliminated, 16 employees (55%) successfully reapplied for other positions within Colonial Bank.

24.    Ms. Graham's allegation that Cary Guffey merely assumed her former duties and is now performing the same job is also incorrect. Although Mr. Guffey has assumed some of Ms. Guy's former training duties regarding insurance and fixed-rate annuities, those duties comprise only a portion of the duties of the new Wholesaler position. Unlike the two former Platform Annuity Trainer positions, the new Wholesalers (supervised by the new Program Director), are responsible for duties requiring various NASD licenses and an extensive knowledge of NASD products. In particular, the Wholesalers provide sales training and product support to Colonial's NASD licensed Financial Consultants. Consequently, in order to train and to support Financial Consultants, a Wholesaler by definition is required to hold certain NASD licenses and to be in good standing with the U.S. Securities and Exchange Commission and the National Association of Securities Dealers. The job description for the Wholesaler position, which I created and approved pursuant to the assistance and recommendation of Huntington, explicitly sets forth the NASD licensing requirements and further provides that the Wholesaler will be required to provide product and sales training, direction and support to licensed employees, including brokers. A true and correct copy of the Job Announcement for the Regional Sales & Development Wholesaler is attached hereto as Attachment No. 3.

25.    In evaluating Kitty Graham's future within Wealth Management, I was faced with the undeniable fact that she could not serve as a Wholesaler because she lacked NASD licensing

and had no experience whatsoever regarding the sale and marketing of NASD regulated products. Furthermore, Ms. Graham had an opportunity to obtain NASD licensing and, in fact, established that aspiration as a personal goal during her 2001 annual review. The division not only encouraged that goal, but also formally established a testing window for her to sit for the exam.[5] Nevertheless, Ms. Graham did not sit for a single NASD licensing exam. Without proper licensing, Ms. Graham lacked an essential and necessary qualification for the Wholesaler position. Consequently, I concluded that she was not qualified to provide the necessary sales training and product support to Colonial's NASD licensed Financial Consultants.

26.     On or about January 24, 2005, I promoted Cary Guffey internally from the position of Financial Consultant to one of the two new Wholesaler positions. At the time of his promotion, Mr. Guffey had worked for approximately 2½ years as a Financial Consultant in the Wealth Management division, where he worked with and trained Licensed Bankers in a 12-branch territory with respect to the sale of insurance and fixed annuities. Unlike Ms. Graham, however, at the time of his promotion, Mr. Guffey was licensed by the NASD and, in fact, held Series 6, 7 and 63 NASD licenses. Additionally, before accepting employment with Colonial in July 2002, Mr. Guffey worked for three years as a broker for Merrill Lynch marketing and selling NASD licensed products. Thus, in addition to his experience in selling insurance and fixed annuities, Mr. Guffey had extensive experience selling stocks, mutual funds, bonds and other NASD regulated products. Mr. Guffey also has been licensed by the State of Alabama to sell insurance products since 1999 and, in fact, sold those products to Colonial customers in his capacity as a Financial Consultant. I also found that Mr. Guffey was well-respected among his

---

[5] Colonial established a testing window for Graham to take her series 6 and 63 exams, on July 13, 2002, which expired on November 11, 2002.

peers and the various branches in his sales territory, and that he maintains a very professional deportment.

27.    In sum, I found that Mr. Guffey was qualified for the position and that he specifically was qualified to perform many job duties which Kitty Graham never performed as a Trainer and, in fact, could not perform without the requisite NASD licensing.   Based on these factors, I chose to promote Mr. Guffey to one of the two new Wholesaler positions.

**FURTHER THE AFFIANT SAYETH NOT.**

_____
Linda Green

**SWORN TO AND SUBSCRIBED BEFORE ME** on this the _14th_ day of _August_ 2006.

(SEAL)

_____
Notary Public
My Commission Expires: _11-17-2009_

14