# EXHIBIT B

# AFFIDAVIT OF RANA SANDERS

STATE OF ALABAMA )
MONTGOMERY COUNTY )

Personally appeared before me, the undersigned Notary Public in and for the State of Alabama at Large, Rana Sanders, who is known to me and who, being duly sworn, deposes and says on oath as follows:

My name is Rana Sanders. I am over the age of nineteen (19) and this affidavit is based on my personal knowledge.

1. I have worked in the banking industry since 1992. I held the position of Executive Vice President of Wealth Management and the position of President of Colonial Brokerage and Colonial Insurance Services from 1999 until around April 2004, when I decided to accept a job as Vice President, Financial Affairs at ~~First Community~~ La Community Bank in ~~Wetumpka~~ Elmore County, where I am now employed.

2. During my tenure at Colonial, I was the highest level employee in the Wealth Management Department[1] and reported directly to the CEO of Colonial, ~~Bobby~~ ~~[redacted]~~. Also, during the approximate five (5) years that I worked as the Executive Vice President of Wealth Management and as the President of Colonial Brokerage and Colonial Insurance Services, I was Susan Guy's direct supervisor.

3. Around 2003, Kitty Graham began working in the Wealth Management Department and reported directly to Susan Guy. She was recruited to work in our department because of her outstanding performance selling fixed annuities and life insurance. It was felt that others within Colonial's Platform program could greatly benefit from her knowledge and ability and this proved to be true. Furthermore, the fact that she had worked her way up in the banking business, successfully performing the very

---

[1] The Wealth Management Department is also referred to as Financial Planning Services on some bank documents.

same job responsibilities as many of the Platform agents, made her more effective in relating to their various problems and concerns.

4. As President of Colonial's Brokerage Services, I am extremely familiar with NASD licensing and, in fact, hold the following securities licenses: a series 63, a series 7 and a series 24. It was, in fact, ultimately one of my responsibilities to ensure that the employees that worked in the Wealth Management Department under my umbrella of supervision held the proper licensing to successfully and legally perform their jobs. In order to ensure that employees were properly licensed to carry out the functions of their job, a compliance department, consisting of eight (8) employees and a supervisor who reported directly to me, monitored the licenses of the employees within the Wealth Management Department.

5. With regard to Kitty Graham, she had a life insurance license. This is the only license required for her to perform her job of selling fixed annuities and life insurance and later training others how to do the same. An NASD securities license, whether it is a 7, 65, 24 or 63, is simply not required or necessary to sale fixed annuities and life insurance and it is inaccurate for anyone to suggest such a thing. I might add that at no time did anyone ever indicate to me in any way that Kitty Graham needed any of the aforementioned security licenses to successfully and legally perform her job for Colonial.

6. No one ever indicated to me that Kitty Graham was not effectively carrying out her job responsibilities for Colonial Bank. In fact, the only complaint of any kind I ever heard about Kitty Graham was that on occasion her training sessions ran a little on the lengthy side. As far as I was concerned, I believed that merely showed her enthusiasm and commitment for performing a job well done.

7. Susan Guy was considered a very valuable employee by me and others at Colonial Bank. She too had the necessary insurance license to successfully perform her job of Family Insurance Manager and Insurance Director. She was not required to have

any kind of NASD license, including but not limited to a Series 7, 65, 24 or 63, to perform her job.

8. Ms. Guy was very forceful and aggressive in encouraging and motivating others to perform at their best. I recall how frustrated she was that neither she nor anyone in the Wealth Management Department, including Kitty Graham, had any control over the performance level of the employees working in the Platform sales area. On a number of occasions, Ms. Guy expressed to me her concerns about their lack of accountability to her department and how the platform agents' job performance would be enhanced if she too were allowed to take part in their job evaluations.

9. I can honestly say that in my approximately 13 years in the banking business, I have rarely met an employee as dedicated to her job and as knowledgeable about the business as Susan Guy. I found Ms. Guy to be extremely hard working, caring, sincere, honest and generous in her efforts to help other employees. She was also very loyal to Colonial.

10. In addition, I received a lot of positive feedback about the manner in which Ms. Guy carried out her numerous job responsibilities. On a regular basis, Regional Presidents to Regional Sales Administrators would contact me and give accolades about Ms. Guy's exceptional skills, the impressive manner in which she had given a presentation and/or her remarkable knowledge of the programs or the products. Ms. Guy had a well-deserved reputation with Colonial and with Colonial's customers of being able to successfully get things done.

11. Ms. Guy did an outstanding job overseeing the Platform Annuity Program. The Platform Annuity Program was in fact a very successful program due in large part to the long hours, commitment and skills that both Ms. Guy and Ms. Graham gave to the program. To the best of my recollection, it made budget every single month that I was there. This was especially noteworthy since this platform program was not actively running until around the summer of 2000. Because of the program's ability to make

money for the bank regardless of the state of the economy, the CEO Bobby Lowder would rely upon it to make up for weak returns elsewhere in the company.

12. The National Association of Securities Dealers (NASD) would not allow an individual to "park" a license. There is actually a securities regulation that prohibits this practice. If indeed an employee acquired a securities license and did not use it, i.e., "parked" it, that would be considered a violation and the department in which the individual worked would be written up. In fact, the NASD audits banks every couple of years to ensure, among other things, that securities licenses are not being "parked." Since neither Ms. Guy nor Ms. Graham needed nor would have had to use a security license to perform their job responsibilities, they could have been in violation of the above referenced regulation if they had in fact acquired any of the security licenses in issue. However, given their proven abilities, I am quite certain that they would be able to pass the necessary security exams if indeed a security license became a requirement for them to perform their job responsibilities.

13. It was not unusual for me to hire an employee that did not have the necessary license called for in a job description. My practice would be to allow that new employee a certain period of time in which to acquire the license and if, for whatever reasons, they were unable to do so, I would place them in another position for which they were qualified. This practice was never questioned.

*Rana Sanders* (signature)
**Rana Sanders**

STATE OF ALABAMA       )
MONTGOMERY COUNTY      )

    I, the undersigned, a Notary Public in and for said County in said State, hereby certify that **Rana Sanders,** whose name is signed to the foregoing affidavit, and who is known to me, acknowledged before me on this day that she does swear the foregoing affidavit is true and correct, and that she executed the same voluntarily on this date.

    SWORN TO AND SUBSCRIBED BEFORE ME this 31st day of August, 2005August, 2005.

NOTARY PUBLIC

My Commission expires: 7-30-08