# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **KITTY GRAHAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **vs.** | ) | **2:06 CV270-WKW** |
| | ) | |
| **THE COLONIAL BANCGROUP, INC.** | ) | |
| **and COLONIAL BANK, N.A.,** | ) | **DRB Magistrate Judge Assigned** |
| | ) | |
| **Defendants.** | ) | |

### DEFENDANTS' MEMORANDUM OF LAW IN REPLY TO PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMMARY JUDGMENT (Doc. No. 22)

**COME NOW** Defendants, The Colonial BancGroup, Inc. and Colonial Bank, N.A. (collectively, "Colonial"), and submit the following Memorandum of Law in Reply to Plaintiff's Memorandum of Law in Support of Response in Opposition to Defendants' Motion for Summary Judgment submitted by Plaintiff Graham on September 22, 2006 (Doc. no. 22).

## I.    INTRODUCTION

Colonial previously has established its entitlement of summary judgment on all of Plaintiff's claims.  Nevertheless, Plaintiff Graham asserts numerous arguments in her Response Brief that are either misleading or wholly unsupported by the evidence and which, therefore, compel this additional reply.  As will be further established herein:

- Plaintiff has failed to establish her *prima facie* case for her ADEA claim because she has not shown that she was "replaced" by a younger employee;

- Plaintiff likewise has failed to establish her *prima facie* case for any of her claims because she cannot show that she was qualified for the Regional Sales & Development Wholesaler position;

- Even assuming, *arguendo*, that Plaintiff has establish a *prima*

*facie* case for each of her claims, she has failed to establish that each of Colonial's proffered legitimate, nondiscriminatory reasons for appointing Cary Guffey rather than her to the Regional Sales & Development Wholesaler position were a pretext for discriminating against her on the basis of her age or her gender; and

- Plaintiff has failed to submit any evidence, direct or otherwise, of discriminatory intent.

For all of these reasons, as well as those reasons set forth in Colonial's original summary judgment brief, Colonial is entitled to summary judgment on all of Plaintiff's claims as a matter of law.

## II.     ADDITIONAL ARGUMENT

### PART I – PLAINTIFF HAS FAILED TO SUSTAIN HER *PRIMA FACIE* CLAIMS.

### A.     PLAINTIFF GRAHAM HAS FAILED TO ESTABLISH A *PRIMA FACIE* CASE FOR HER ADEA CLAIM BECAUSE SHE WAS NOT REPLACED BY CARY GUFFEY.

It is well-settled law that in order to establish a *prima facie* case under the ADEA, the plaintiff must show, among other things, that she was replaced with a person outside the protected group. *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002); *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989), *cert. dismissed*, 493 U.S. 1064 (1990). Merely assuming *some* of the plaintiff's former duties does not, as a matter of law, establish a *prima facie* case under the ADEA. *See, e.g.*, *Minton v. Am. Bankers Ins. Group, Inc.*, No. 02-12942, 2003 WL 21303330, *1 (11th Cir. Feb. 6, 2003) (affirming summary judgment for employer on ADEA claim that found employee was not replaced when coworker merely absorbed some of plaintiff's duties); *Edwards v. Baptist Health*, Civ. A. 204CV561AWO, 2005 WL 1331262, *8 (M.D. Ala. 2005) (holding that the mere fact that a younger employee assumed some of the plaintiff's former duties, was insufficient to establish a *prima facie* case under the

ADEA).[1]  Furthermore, "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 443-44 (11th Cir. 1996) (internal citations omitted).

In her Response Brief, Plaintiff contends that Colonial merely re-titled her Platform Annuity Agent Trainer position (hereinafter, the "Trainer" position) as the Regional Sales & Development Wholesaler position (hereinafter, the "Wholesaler" position) in order to replace her with Cary Guffey, a younger male.  Pl's. Resp. Br. (Doc. no. 22) at 1-2, 9.  In support of her argument, Plaintiff contends that, in his capacity as a Wholesaler, Guffey is performing the same duties she performed Trainer.  *Id.*  Other than her own conclusory assertions, however, Plaintiff offers *no* evidence to support that claim.  She also fails to rebut the specific evidence set forth in Colonial's initial summary judgment brief and evidentiary submissions in support thereof.

As set out in great detail in the affidavit of Linda Graham, Director of Colonial's Wealth Management division, after extensive consultation with the Huntington Investment Company, a well-respected and independent banking consulting firm, the Wealth Management division made the decision to combine the functions of the Family Insurance and Product Management sections into a single section responsible for all investment products to increase efficiency, revenues and profitability.  L. Green Aff., (Doc. no. 17) at Ex. A, ¶¶19-20.  Pursuant to this consolidation, Wealth Management eliminated certain positions and reassigned the duties of those positions to

---

[1]  *See also Stubblefield v. Trinity Indus., Inc.*, 961 F. Supp. 1553, 1558 (M.D. Ala. 1997) (*citing Barnes v. GenCorp. Inc.*, 896 F.2d 1457 (6th Cir.), *cert. denied*, 498 U.S. 878 (1990)) (holding a person is not replaced when another employee is assigned to perform that person's duties in addition to other duties); *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996) (stating that "the test for position elimination is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position"); *Collier v. Budd Co.*, 66 F.3d 886, 890 n.5 (7th Cir. 1995) (holding that shifting and/or consolidating work does not constitute replacement); *Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 763 (8th Cir. 1995) (during reduction in force, fact that plaintiff's duties were assumed by younger person is not in itself enough to establish *prima facie* case under ADEA).

other jobs. *Id.* at ¶19. That is exactly the case *vis-à-vis* Plaintiff Graham because when Wealth Management eliminated the Family Insurance section, it also eliminated the Trainer position held by Graham. *Id.* at ¶¶19-20. Colonial ultimately reassigned most of the duties of both Trainer positions to two newly-created Wholesaler positions who, in addition to providing sales training regarding insurance and fixed annuities are also responsible for providing sales training and product support regarding NASD regulated products, *e.g.*, stocks, bonds, mutual funds and variable annuities.[2] L. Green Aff. (Doc. no. 17) at Ex. A, ¶19; C. Guffey Aff. (Doc. no. 17) at Ex. I, ¶7. Thus, notwithstanding Plaintiff's unsubstantiated claims to the contrary, the Wholesaler position is not the former Trainer position by another title. Rather, it is the result of a consolidation of the duties performed by the Trainers with NASD-related training duties performed within the former Program Management section.

Contrary to Plaintiff's naked assertion, the undisputed affidavit testimony of Linda Green establishes that, in addition to his training duties regarding the sale and marketing of insurance and fixed annuities, as a Wholesaler, Guffey also is responsible for providing sales and marketing training to 17 Financial Consultants/Team Leaders operating at various branch banks in Alabama, Georgia, Texas and Nevada. L. Green Aff., (Doc. no. 17) at Ex. A, ¶¶19, 24; C. Guffey Aff. (Doc. no. 17) at Ex. I, ¶7. Furthermore, Guffey coordinates clearance, settlement and custody services for Colonial customers with UVEST, a leading provider of third-party brokerage services to financial institutions. C. Guffey Aff. (Doc. no. 17) at Ex. I, ¶7.

In contrast, it is undisputed that in her capacity as a Trainer, a position that she only occupied for 18 months, Graham had *no* responsibilities regarding NASD products. L. Green Aff. (Doc. no. 17) at Ex. A, ¶¶7, 24-25, 27. In particular, she had no responsibility for training

---

[2]  Variable annuities are securities regulated by the SEC. *See* http://www.sec.gov/answers/annuity.htm. Fixed annuities are not securities and are not regulated by the SEC. *Id.*

Colonial Financial consultants or any Colonial employees regarding the sale and marketing of NASD regulated products or for coordinating clearance, settlement and custody services with UVEST, duties that are critical functions of the Wholesaler position. In fact, as previously noted, prior to the creation of the two Wholesaler positions, most of the NASD-related duties, including sales training, were assigned to the Product Management section. *See* L. Green Aff. (Doc. no. 17) at Ex. A, ¶¶8, 18. As a Trainer, all of Graham's former job functions revolved around the training of Licensed Bankers and Financial Consultants regarding the sale of insurance and fixed annuity products, not NASD regulated products. L. Green Aff. (Doc. no. 17) at Ex. A, ¶¶24-25. Even assuming the accuracy of the list of her self-described duties as a Trainer set forth in her supplemental affidavit, the duties described therein compellingly demonstrate that Graham's position exclusively concerned life insurance and fixed annuity products and not NASD regulated products. *See* K. Graham Aff. (Doc. no. 23), Ex. A at ¶8. Nowhere in her Response Brief, in her affidavit or in her other evidentiary submissions does Graham establish, or even claim, that she performed NASD-related duties. Those duties were neither assigned to her as a Trainer, nor could they be assigned to her in the absence of proper NASD licensing. L. Green (Doc. no. 17) at Ex. A, ¶¶7, 24-25, 27.

Furthermore, the fact that the Trainer and the Wholesaler are distinct and different positions is further established by Guffey's undisputed affidavit testimony that NASD-related duties, *i.e.*, duties concerning stocks, bonds, mutual funds and variable annuities, constitute a significant percentage (35%) of the Wholesaler's duties. C. Guffey Aff. (Doc. no. 17) at Ex. I, ¶9. Plaintiff Graham, however, has never performed these duties, and she has offered no evidence to the contrary.

In support of her argument that Colonial merely re-titled her position and assigned her same duties to Cary Guffey, Graham attempts to rely on the brief description of the new Wholesaler position set forth in the January 18, 2005 memorandum drafted by Wealth Management Director Linda Green announcing the appointment of Guffey (and others) to the new position. Pl's. Resp. Br. (Doc. no. 22), at 9. In essence, Graham claims, without support, that the announcement somehow "defined" the duties of the position and that she performed those duties as one of two Trainers.[3] Id; Pl's. Resp. Br. (Doc. no. 22), at 9. However, the January 18, 2005 memorandum announcing Guffey's appointment is merely an announcement and not a formal job description in any sense of the term. Supplemental Affidavit of Linda Green ("L. Green Supp. Aff.), Ex. N at ¶4. Moreover, the author of the announcement, Linda Green, specifically refutes Graham's conclusory allegation that the Trainer position and the Wholesaler position are one-and-the-same:

> 24.    Ms. Graham's allegation that Cary Guffey merely assumed her former duties and is now performing the same job is also incorrect. Although Mr. Guffey has assumed some of Ms. Graham's former training duties regarding insurance and fixed-rate annuities, those duties comprise only a portion of the duties of the new Wholesaler position. Unlike the two former Platform Annuity Trainer positions, the new Wholesalers (supervised by the new Program Director), are responsible for duties requiring various NASD licenses and an extensive knowledge of NASD products. In particular, the Wholesalers provide sales training and product support to Colonial's NASD licensed Financial Consultants. Consequently, in order to train and to support Financial Consultants, a Wholesaler by definition is required to hold certain NASD licenses and to be in good standing with the U.S. Securities and Exchange Commission and the National Association of Securities Dealers. The job description for the Wholesaler

---

[3]  The language of the memorandum merely describes in general terms some of the functions of Cary Guffey's new position: "He is responsible for coordinating and implementing all sales programs with licensed bankers and team leaders." 01/18/06 Memorandum (Doc. no. 22) at Ex. E. Unlike Graham's position as Platform Annuity Agent Trainer, however, those duties, even generally described, would include providing sales training and product support for Team Leaders (i.e., Financial Consultants) regarding NASD regulated products, a function Graham never performed and could not perform in her capacity as Platform Annuity Agent Trainer. See L. Green Aff. (Doc. no. 17) at Ex. A, ¶¶7, 24-25, 27.

position, which I created and approved pursuant to the assistance and recommendation of Huntington, explicitly sets forth the NASD licensing requirements and further provides that the Wholesaler will be required to provide product and sales training, direction and support to licensed employees, including brokers.

Green Aff. (Doc. no. 17) at Ex. A, ¶24. Green's testimony stands unrebutted.

The actual job descriptions for the Wholesaler and Trainer positions, it is patently obviously that the positions further illustrate that the positions are different. For example, the job description for the Trainer position formerly held by Plaintiff summarizes the goal of the position as increasing the gross sales and fee income for the platform program, *i.e.*, the Family Insurance section, and further notes that the Trainer has no supervisory responsibilities. Platform Annuity Agent Trainer Job Description (Doc. no. 17) at Ex. G. In contrast, the job description for the Wholesaler position establishes the responsibility of the Wholesaler for managing licensed brokers, investment team leader and other retail bank employees to increase revenue for investment and insurance. Regional Sales & Development Wholesaler Job Description (Doc. no. 17) at Ex. E. In other words, the functions and duties of the Wholesaler position are much broader than those functions of the former Trainer position because they include responsibilities relating to all investment products offered by Colonial Bank, including providing training and product support regarding NASD regulated products such as stocks, bonds, mutual funds and variable annuities and not, as was the case of the Trainer, duties related solely to insurance and fixed annuities. That is precisely the reason why the Wholesaler job description includes minimum qualifications regarding NASD licensing and experience; whereas the job description for the Trainer position had no such requirement. *Compare* Regional Sales & Development Wholesaler Job Description, (Doc. no. 17) at Ex. E *with* Platform Annuity Agent Trainer Job Description (Doc. no. 17) at Ex. I. Now, instead of two sections performing independent training functions, the two Wholesalers conduct all of the training regarding Colonial investment

products – training concerning the sale of NASD regulated products as well as insurance and fixed annuity products. The creation of the new Wholesaler position reflects accomplishment of one of the primary goals of the Wealth Management restructuring – the elimination of unnecessary positions by consolidating positions and duties. *See* L. Green Aff., (Doc. no. 17) at Ex. A, ¶6.

In sum, Plaintiff Graham's former duties as a Trainer no longer constitute a single, distinct position. Not only has Plaintiff failed to establish evidence to the contrary, but also, she has offered no evidence that Colonial's legitimate business purpose of restructuring its departments and consolidating two positions was a pretext for age discrimination. Therefore, because she has failed to show that Cary Guffey "replaced" her and performed her same job, Plaintiff cannot sustain her *prima facie* case under the ADEA. For this reason, Colonial is entitled to summary judgment on Plaintiff's ADEA claim.

**B.** **PLAINTIFF HAS FAILED TO SUSTAIN HER *PRIMA FACIE* CASE FOR ANY OF HER CLAIMS BECAUSE SHE WAS OBJECTIVELY UNQUALIFIED FOR THE WHOLESALER POSITION.**

Colonial is also entitled to summary judgment on all of Plaintiff's claims because she was objectively unqualified for the Wholesaler position. In order to sustain her case under Title VII, the ADEA, or as a failure to promote claim, Plaintiff must show, among other things, that she was qualified to do the job. *See e.g.*, *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989), *cert. dismissed*, 493 U.S. 1064 (1990) (*prima facie* case under the ADEA required the plaintiff to establish that she was qualified for the position at issue); *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (holding that plaintiff must establish that she was qualified to do the job to sustain her *prima facie* case under Title VII); *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001) (holding that in a failure to promote claim, to

sustain a *prima facie* case, the plaintiff must establish that she was qualified for the position). Furthermore, to demonstrate that she was qualified for the position, Plaintiff must show that she satisfied the employer's objective qualifications. *See Vessels v. Atlanta Independent School System,* 408 F.3d 763, 769 (11th Cir. 2005); *see also Roper v. Foley*, No. 05-15149, 2000 WL 1004377, slip op. at *5 (11th Cir. April 18, 2006); *King v. Publix Supermarkets, Inc.*, No. 1:05-cv-486-WSD-ECS, 2006 WL 2166729, slip. Op. at *5 (N.D. Ga. July 28, 2006). In the absence of that evidence, Colonial is entitled to summary judgment on all of Plaintiff's claims as a matter of law. In this case, it is a binary analysis. Graham was either qualified or she was not.

Notwithstanding her unsupported assertions, Plaintiff Graham has failed to rebut Colonial's evidence that objectively she lacked both NASD licensing and the knowledge and experience of NASD regulated products necessary to perform the duties of a Wholesaler. In particular, as established by Colonial in its initial summary judgment brief, a significant percentage of the Wholesaler's duties (35%) involve NASD-related issues, *e.g.,* providing sales training and product support (under the direction of the Program Director) to 17 Financial Consultants regarding the sale of NASD products and coordinating clearance, settlement and custody services for Colonial customers with third party broker UVEST Financial Services. C. Guffey Aff. (Doc. no. 17) at Ex. I. ¶¶8; *see also* L. Green Aff. (Doc. no. 17) at Ex. A, ¶24.

Based on these undisputed facts, Colonial concluded that certain "NASD licenses and an extensive knowledge of NASD products", as well as a record of good standing with the Securities and Exchange Commission and the National Association of Securities Dealers, were essential minimum qualifications of the Wholesaler position. *See* L. Green Aff. (Doc. no. 17) at Ex. A, ¶24. Consequently, Wealth Management Director Linda Green, with the assistance and

recommendation of the Huntington Investment Company, created and approved the Wholesaler

job description, which specifically established the NASD licensing and experience requirements:

### Education and Experience

> Bachelor's degree in Finance, Accounting, Business.  Five or more
> years experience in developing marketing, training and/or selling
> in the investments and/or insurance industry.  *Completion of
> Series 7, 65, 24, and 63 securities examinations*[4]; completion of
> Life/Health/Disability and Variable Life insurance License; clean
> CRD—*good standing with NASD and SEC*.  Valid state driver's
> license, proof of insurance, and available transportation.

Regional Sales & Development Wholesaler Job Description (Doc. no. 17) at Ex. E (emphasis

added); L. Green Aff. (Doc. no. 17) at Ex. A, ¶24.  Plaintiff's success or failure in meeting the

licensing and good standing requirements is an objective fact.    Contrary to Plaintiff's

unsupported declaration, the unrebutted facts demonstrate that Plaintiff failed to meet Colonial's

legitimate, reasonable and nondiscriminatory minimum qualifications for the Wholesaler

position.

    In this instance, Colonial sought not only a candidate who had experience regarding the

sale and marketing of insurance and fixed annuities, but also a candidate who was licensed by

the NASD and who had practical experience in the equities market.  L. Green Aff. (Doc. no. 17)

at Ex. A, ¶¶19, 25.  That requirement is clearly reasonable and job-related in light of the daily

duties and functions of the Wholesaler position, *e.g.*, providing training and product support to

NASD licensed Financial Consultants.    Furthermore, it is well within the authority of an

employer to establish legitimate, non-discriminatory minimum qualifications for a position.  *See,

e.g., Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1218 (7th Cir. 1980), *cert. denied*

450 U.S. 959 (1981) (qualification depends upon the nature of the business).  The right of the

---

[4]  A Series 7 license allows an individual to act as a general securities representative.  A Series 24 license allows
managers to supervise branch activities.  A Series 63 license allows an individual to solicit sales under state law.  A
Series 65 license allows an individual to act as an investment advisor.

employer to establish legitimate, nondiscriminatory minimum qualifications for a position is cogently illustrated by the court's decision in *Coleman v. St. Regis Corp.,* 1985 WL 350, *4 (N.D. Ala. 1985).

In *Coleman,* the plaintiff, a 61-year-old male, was employed as a storeroom clerk in the maintenance department and was laid off after the company down-sized due to a decrease in business. After two years passed and business improved, the company created a new position that included the plaintiff's prior duties, as well as additional tasks involving computer programming and accounting. *Id.* at *1. The defendant company did not offer the new position to the plaintiff, but rather, hired a 26-year-old male with a college degree and the requisite computer and accounting qualifications. *Id.* The plaintiff sued for violation of the ADEA, claiming that the company should have rehired him for the position and that he was discriminatorily replaced by a younger person. *Id.* at 2.

The court rejected plaintiff's argument, holding that the job performed by the new employee was a separate and distinct position from that of storeroom clerk or any other position established prior to the layoff. *Id.* at *2. Additionally, the court recognized that:

> An employer is entitled to establish legitimate, non-discriminatory minimum qualifications for a position. In this instance, the company wanted someone with some computer and accounting skills. The requirements were reasonable expectations of the company, and were non-discriminatory. Although the plaintiff asserts that he met the requirements at least as well as Tucker did, this assertion is not supported by the facts presented. The plaintiff had never dealt with computers and has only a limited accounting background which is by now dated. The court, therefore, concludes that the plaintiff did not qualify for the position filled by Tucker.

*Id.* at *4 (citation omitted).

*Coleman* is directly on point. As in *Coleman*, Colonial eliminated Graham's position and ultimately reassigned her duties to one of two new Wholesaler positions. Likewise, as in *Coleman*, when Colonial created the new Wholesaler positions, it added NASD-related training and product support duties in addition to Plaintiff's former duties regarding insurance and fixed annuities. L. Green Aff. (Doc. no. 17) at Ex. A, ¶¶ 19, 24. Those facts stand unrebutted. At the time that Cary Guffey was appointed as one of two Wholesalers on January 18, 2005, Plaintiff Graham did not possess a single NASD license, and she had no existing relationship, let alone a record of good standing, with NASD or the SEC. Furthermore, Graham had no brokerage experience or experience selling, or training others to sell, NASD regulated products. Rather, her investment experience was limited to insurance and fixed annuity related functions. Based on these facts, Wealth Management Director Linda Green concluded that Plaintiff Graham was not qualified for the Wholesaler position. L. Green Aff. (Doc. no. 17) at Ex. A, ¶25.

Given these undisputed facts, accepting Plaintiff's claim that she was qualified for the Wholesaler position regardless of her inability to meet the minimum qualifications of the position would require the Court to second guess Colonial's legitimate assessment of Graham's qualifications and its reasonable conclusion that she was unqualified for the position. As consistently held by the Eleventh Circuit, however, the Court should not "second-guess a company's legitimate assessment of whether an employee is qualified for a particular position." *Steger v. General Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003).

Plaintiff also suggests that NASD licensing is not required for the Wholesaler position because Colonial never required her to hold an NASD license to perform her duties as a Trainer and, further, that Colonial should have allowed her an allegedly customary 6-month period to obtain the requisite qualifications. Pl.'s Resp. Br. (Doc. no. 22) at 3-4. The Court should reject

Plaintiff's contentions for several reasons. First, Colonial willingly concedes that NASD licensing was not a requirement for Plaintiff Graham's previous position for the most obvious reason that her duties as a Trainer did not require NASD licensing or an extensive knowledge of NASD products. Indeed, that fact further bolsters Colonial's argument that the Trainer and Wholesaler positions were distinctly different positions. The fact that Plaintiff was qualified for her Trainer position without holding any NASD licenses, however, does not establish her qualifications for the Wholesaler position. As stated by the Eleventh Circuit, "[w]here a particular job position is entirely eliminated for nondiscriminatory reasons, for a plaintiff to prevail against h[er] employer [s]he must show that [s]he was qualified for another available job with that employer; *qualification for h[er] current position is not enough*." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082-83 (11th Cir. 1990) (emphasis added).

Moreover, although it is true that Colonial has allowed some current employees sufficient opportunity to meet any new qualifications resulting from a modification of an existing job description, that scenario is not at issue in the instant case. In the instant case, rather than upgrading or modifying an existing position, the undisputed facts establish that Colonial created an entirely new position that not only subsumed many of Plaintiff's former Trainer duties, but also included a majority of NASD-related duties never performed by Plaintiff as a Trainer. Moreover, Plaintiff does not assert, and has presented no evidence, that the Wealth Management division has a policy allowing a presently unqualified job applicant seeking a new and different position sufficient time to qualify for the position.

If, as urged by Plaintiff, the Court could compel Colonial to hire an unqualified applicant and allow the applicant additional time to satisfy the minimum qualifications of the position, then virtually every plaintiff would be able to meet the qualifications requirement of a *prima*

*facie* case by simply expressing their intention to become qualified at some future date. More importantly, employers such as Colonial would be placed in the untenable position of being forced to fill a vacancy with an unqualified candidate who could not perform essential duties of the position when hired.[5]   In the instant case, allowing Plaintiff six months to obtain the necessary NASD licenses would leave Colonial without a qualified Wholesaler to perform any of the NASD-related duties. Clearly, that would be an absurd result.[6]

Additionally, the mere fact that Plaintiff aspired to obtain her Series 6 license is insufficient to establish her qualification for the Wholesaler position. On that issue, the Eleventh Circuit case law is unambiguous. As held in *Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1276-77 n.6 (11th Cir. 2002), the mere fact that a plaintiff expresses an interest in obtaining a license necessary for a position does not establish that the plaintiff is qualified for the position for purposes of a discrimination claim. Furthermore, as established by the unrebutted affidavit testimony of Linda Green, Plaintiff Graham had almost four years to obtain her Series 6 license and failed to do so:

> 25.    . …   Furthermore, Ms. Graham had an opportunity to obtain NASD licensing and, in fact, established that aspiration as a personal goal during her 2001 annual review. The division not only encouraged that goal, but also formally established a testing window for her to sit for the exam.[7]   Nevertheless, Ms. Graham did not sit for a single NASD licensing exam. Without proper licensing, Ms. Graham lacked an essential and necessary qualification for the Wholesaler position. Consequently, I

---

[5]  Of course, a private company can always voluntarily choose to hire an employee who may obtain the requisite license at some established future date, *e.g.*, a law firm hiring a law school graduate awaiting her bar exam results. Even so, that lawyer would be restricted from certain functions until she obtained her license.

[6]  Plaintiff made no such allegations of disparate impact by the NASD licensing and experience requirements and has not offered any evidence of disparate impact that would call into question the minimum requirements of the Regional Sales & Development Wholesaler position established by Colonial. *See Eastland v. Tennessee Valley Authority,* 704 F.2d 613, 619 (11th Cir.1983) ("[t]he aggrieved party must prove a disparate impact due to the selection procedure."); *Ferguson v. Veterans Administration,* 723 F.2d 871, 873 (11th Cir. 1984) (plaintiff seeking librarian position who did not have requisite educational requirements failed to prove that the selection process impacted adversely upon women or that the affirmative action program was executed in a discriminatory manner).

[7]  Colonial established a testing window for Graham to take her series 6 and 63 exams, on July 13, 2002, which expired on November 11, 2002.

> concluded that she was not qualified to provide the necessary sales
> training and product support to Colonial's NASD licensed
> Financial Consultants.

L. Green Aff. (Doc. no. 17) at Ex. A, ¶25.  Even if Plaintiff Graham had been provided

additional time to pass the Series 6 exam, a single license would not satisfy the other essential

qualifications of the position, including completion of the Series 24, 63 and 65 exams (or the

equivalents thereof) and a record of good standing with NASD and the SEC, qualifications

which Cary Guffey undisputedly held.  Moreover, Plaintiff would still lack the practical

experience in the equities market necessary to successfully perform the functions of the

Wholesaler position.

Plaintiff further alleges that there is evidence of Colonial's discriminatory intent because

Wealth Management Director, Linda Green, the decision-maker with regards to Plaintiff's

promotion claim, was promoted to her position as Director of Wealth Management Director

despite the fact that she did not hold the NASD licenses required by the job description.  *See Guy*

*Resp.* Brief (Doc. no. 22) at 3.  In other words, with regards to the NASD licensing requirement,

Plaintiff argues that she was treated differently than a similarly situated employee.  The Court

should reject this argument, however, because Linda Green is not a similarly situated

comparator.

First, Green is not a similarly situated comparator because she is a member of the same

protected class, *i.e.*, she is a female employee over the age of 40.  In fact, it is well-settled law

that in instances of alleged disparate treatment, the plaintiff must show that she was:  (1) a

member of a protected class; (2) qualified for the position or entitled to the benefit sought; (3)

subjected to adverse employment action; and (4) that the employer treated ***similarly situated***

***employees outside the class*** more favorably.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

804 (1973); *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997); *see also Dobson v. Central Carolina Bank & Trust Co.*, 240 F. Supp. 2d 514, 521 n.1 (M.D.N.C. 2003) (discussing §1981 employment claims, stating that it "makes sense, therefore, to insist upon evidence of comparators--similarly situated applicants or employees not in the same protected class--in assessing the strength of the inference of a discriminatory motive which *is essential to proof of the claim*") (citation omitted) (emphasis added); *Moreland v. Miami-Dade Co.*, 255 F. Supp. 2d 1304, 1312 n.4 (S.D. Fla. 2002) (since an African American employee was member of same protected class, she was not a valid comparator for purposes of the fourth prong of a disparate treatment case).

Second, Linda Green is not a valid comparator because she was promoted to a completely different, high-level managerial position in the company and was specifically selected for the position by the President and CEO of Colonial Bank, Bobby Lowder. Affidavit of Robert E. Lowder ("R. Lowder Aff."), Ex. M at ¶4. In filling an upper-level management post, some degree of flexibility is allowed, as the decision maker must balance employees' different strengths and qualifications, predicting all the while who will be the best ambassador for the company and most effectively serve its business needs. *See, e.g.*, *Langerman v. Thompson*, 155 F.Supp.2d 490, 500 (D. Md. 2001). In this case, Mr. Lowder concluded that, based on his personal knowledge and experience regarding Ms. Green's performance as President/CEO-Huntsville Region of Colonial Bank, N.A. and, in particular, her management skills and success in implementing sales programs with appropriate accountabilities, she could perform the duties of the Wealth Management Director position and that possession of the NASD licenses was not immediately necessary for her to successfully perform the job. R. Lowder Aff., Ex. M at ¶4; L. Green Supp. Aff., Ex. N at ¶6. In contrast, the daily functions of the Wholesaler in training and

providing product support to Financial Consultants regarding the sale and marketing of NASD regulated products required the Wholesaler to possess both the requisite NASD licenses and experience to perform the duties of the job on day one.

Third, although never mentioned by Plaintiff in her Response Brief, immediately preceding her appointment to the Director position, Ms. Green was diagnosed with breast cancer and underwent a bilateral mastectomy in June 2005 as well as six months of chemotherapy treatment following her surgery. R. Lowder Aff., Ex. M. at 7; L. Green Supp. Aff., Ex. N at ¶7. Even while she was undergoing chemotherapy treatment, she began to prepare for the Series 7 examination in December 2004 and ultimately completed Series 7, 24 and 63 examinations in March, July and December of 2005, respectively. R. Lowder Aff., Ex. M. at 7; L. Green Supp. Aff., Ex. N at ¶7.

In sum, Linda Green is neither a proper comparator, nor is Colonial's treatment of her evidence of discriminatory intent against Plaintiff Graham.

Finally, the fact that Colonial selected Cary Guffey rather than Ann Fuller or Terri Meeves for the Wholesaler position does not establish that Colonial did not consider the NASD requirement to be an important and significant factor in the selection. In fact, Graham's speculation is specifically rebutted by the undisputed affidavit testimony of Linda Green because she clearly states that Graham's lack of NASD licensing and experience was a significant factor in her decision not to select Graham for the Wholesaler position:

> 25.    In evaluating Kitty Graham's future within Wealth Management, I was faced with the undeniable fact that she could not serve as a Wholesaler because she lacked NASD licensing and had no experience whatsoever regarding the sale and marketing of NASD regulated products. . . .

L. Green Aff. (Doc. no. 17) at Ex. A, ¶25.   Again, Green's testimony, unlike Plaintiff's

unsupported speculation and conjecture, stands unrebutted.[8]

In sum, because Graham cannot show she was qualified for the position of Wholesaler,

she cannot establish a *prima facie* case of employment discrimination.  For this reason alone,

Colonial is entitled to summary judgment as a matter of law on all of Plaintiff's claims.

### **PART II – PLAINTIFF HAS FAILED TO ESTABLISH PRETEXT.**

Once the employer meets its burden to produce a non-discriminatory reason for its

actions, the presumption of discrimination is eliminated.   *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 143 (2000).  To survive summary judgment, the employee must

come forward with evidence sufficient to permit a reasonable factfinder to conclude that the

legitimate reasons given by the employer were not its true reasons, but were a pretext for

discrimination.  *Id*; *see also, Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000).

This evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies or

contradictions in the employer's proffered legitimate reasons for its actions that a reasonable

factfinder could find them unworthy of credence." *Cooper v. Southern Co.*, 390 F. 3d 695, 725

(11th Cir. 2004).  In the instant case, assuming, *arguendo*, that Plaintiff has established a *prima*

*facie* of discrimination, her claims still fail as a matter of law because she has failed to establish

that Colonial's proffered reasons for appointing Cary Guffey rather than Graham to the

Wholesaler position were a pretext for discrimination.

---

[8] Plaintiff also offers no evidence that Terri Meeves or Ann Fuller were equally or more qualified than Guffey for the Regional Sales & Development Wholesaler position or that they were even interested in the position. Furthermore, even if Plaintiff could offer such evidence, it would not establish that Colonial's decision to select Guffey rather than her was motivated by her sex or her age.  As established in Colonial's original brief, Guffey had many attractive qualities that lead to his selection, including an MBA, his series 6 and 63 licenses, a state insurance license, experience providing sales training to Licensed Bankers in his territory regarding insurance and fixed annuities, and five years of brokerage experience.  *See* Colonial Sum. Judg. Br. (Doc. no. 18) at 32-33; Guffey Aff. (Doc. no. 17) at Ex. I at ¶¶5-6.

As set forth in its preliminary brief, Colonial has proffered three legitimate, nondiscriminatory reasons for appointing Cary Guffey rather than Graham to the Wholesaler position: (1) Cary Guffey was more qualified for the position; (2) Wealth Management was unprofitable due, in part, to the poor performance of the Family Insurance section managed by Graham, and (3) Graham was not qualified for the job because she lacked the NASD licenses and experience necessary to provide training and product support for Colonial's NASD licensed Financial Consultants.

To overcome Colonial's summary judgment motion, Plaintiff Graham must rebut not just one, but each of Colonial's proffered legitimate, nondiscriminatory reasons. *See Chapman*, 229 F.3d at 1024-25 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether *each* of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.") (emphasis added); *see also Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002) ("Where an employer offers multiple independently sufficient justifications for an adverse employment action, the plaintiff employee must cast doubt on each of them."). Moreover, Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find [all of those reasons] unworthy of credence," *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks and citation omitted), *cert. denied*, 118 S. Ct. 685 (1998); *see also Burdine*, 450 U.S. 248, 256 (1981); *Watkins v. Sverdrup Technology Inc.*, 153 F.3d 1308, 1314 (11th Cir. 1998). Furthermore, because her position was eliminated through a reorganization and reduction-in-force, Plaintiff carries a heavier burden in supporting charges of discrimination than does an employee discharged for other reasons. *See, e.g., Wilson*

*v. Firestone Tire & Rubber*, 932 F.2d 510, 517 (6th Cir. 1991); *Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir. 1986). Finally, "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 443-44 (11th Cir. 1996) (internal citations omitted).

In the instant case, Plaintiff Graham has failed to rebut *any* of Colonial's three proffered legitimate, nondiscriminatory reasons for promoting Cary Guffey rather than her to the newly-created Wholesaler position, and she has failed to establish that Colonial's reasons are unworthy of credence so as to give rise to any disputed material fact that would preclude summary judgment.

A.    **PLAINTIFF GRAHAM HAS FAILED TO REBUT COLONIAL'S EVIDENCE THAT CARY GUFFEY WAS MORE QUALIFIED THAN HER FOR THE WHOLESALER POSITION.**

Colonial's first legitimate, nondiscriminatory reason for appointing Cary Guffey rather than Plaintiff to the Wholesaler position is closely related to the qualifications issue. In particular, assuming *arguendo* that Plaintiff has established her *prima facie* case by showing that she was minimally qualified for the position, Cary Guffey's superior qualifications and skills form the basis of a "legitimate, nondiscriminatory reason" for appointing him rather than Plaintiff to the Wholesaler position. Plaintiff, however, contends that she was the far superior candidate because she had "in excess of 25 years experience selling products in a banking institution, including insurance and annuity products, and years promoting sales and motivating and training licensed agents to increase sales." Pl's. Resp. Br. (Doc. no. 22) at 9-10. Based on these facts, Plaintiff contends that Colonial's conclusion that Guffey was the more qualified candidate is merely pretext for discriminating against her on the basis of age and/or gender.

Again, Plaintiff's personal belief she was at least or more qualified than Guffey is insufficient to withstand summary judgment. *See, e.g., Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253-54 (11th Cir. 2000); *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000) (plaintiff cannot prove pretext by asserting baldly that she was better qualified than the person who received the position at issue); *Holifeld v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (stating that "conclusory assertions . . . in the absence of supporting evidence are insufficient to withstand summary judgment."). Furthermore, Plaintiff cannot prove pretext by merely alleging that she was better qualified than the individual who received the position that she wanted; rather she must establish that the defendant's employment decisions were in fact motivated by age (or gender). *See Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001) (The court must "not ask whether the employer selected the 'most' qualified candidate, but only whether it selected the candidate based on an unlawful motive."). Moreover, to establish pretext, Guy must demonstrate that " 'disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.' " *Ash v. Tyson Foods, Inc.*, 126 S. Ct. 1195, 1197 (Feb. 21.2006) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir.2004)).[9] Clearly, Plaintiff has failed to meet this weighty burden.

---

[9] Although previously cited the former "jump of the page" standard , the U.S. Supreme Court specifically rejected the Eleventh Circuit's previous "jump off the page" standard. *See Ash v. Tyson Foods, Inc.*, 126 S. Ct. 1195, 1197 (Feb. 21.2006). The Court declined to specify the precise standard for determining what level of disparity in qualifications is necessary to establish pretext. However, the Court has cited with approval other language in *Cooper, i.e.*, that "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question". *Ash*, 126 S. Ct. at 1197. Additionally, the Court has also cited with approval the Ninth Circuit's "clearly superior" standard and the D.C. Circuit's "significantly better qualified" standard. *Id.* (citing *Raad v. Fairbanks North Star Borough School Dist.*, 323 F. 3d 1185, 1194 (9th Cir. 2003) and *Aka v. Washington Hospital Center*, 156 F. 3d 1284, 1294 (D.C. Cir. 1998) (en banc)). Since then, the Eleventh Circuit and this District have adhered to the "no reasonable person" standard. *See, e.g., Hubbard v. M&H Valve Co.*, 180 Fed. Appx. 899 (11th Cir. May 22, 2006); *Drakeford v. Alabama Cooperative Extension Sys.*, 425 F.Supp.2d 1274 (M.D. Ala. 2006).

Even assuming for purposes of summary judgment the accuracy of Plaintiff's description of her qualifications, the list of job duties set forth in her supplemental affidavit compellingly illustrates why Cary Guffey was more qualified for the Wholesaler position and that Plaintiff lacked objective qualifications necessary to perform the duties of the Wholesaler position. Specifically, virtually every qualification and function Plaintiff lists in paragraph eight of her supplemental affidavit concern insurance and fixed annuity related functions, *i.e.*, non-NASD regulated investments. K. Graham Aff. (Doc. no. 22) at Ex. A, ¶8. Colonial does not dispute Plaintiff's claim that she had experience regarding insurance and fixed annuities sales. That fact, however, is irrelevant to the issue of whether Plaintiff met the NASD licensing and experience requirements necessary to perform the NASD-related duties representing 35% of the Wholesaler's duties. *See* Guffey Aff. (Doc. no. 17) at Ex. I, ¶9.

Furthermore, although Plaintiff Graham touts her years of banking experience, *see* K. Graham Aff. (Doc. no. 17) at Ex. A, ¶4, most of that experience was not obtained while working at Colonial and was unrelated to the Wholesaler's duties of providing sales training and product support *vis-à-vis* NASD regulated products. In particular, it is undisputed that Graham had only been employed by Colonial for less than five years and that she had only been employed as a Trainer in the Wealth Management division for 18 months (since August 12, 2003). [10] L. Green Aff. (Doc. no. 17) at Ex. A, ¶4; K. Graham Aff. (Doc. no. 17) at 4; Pl.'s Resp. Br. (Doc. no. 22) at 4-5). In other words, she had been training Licensed Bankers regarding the sale of insurance and fixed annuities for **only 18 months** and had no experience whatsoever training Colonial employees regarding the sale and marketing of NASD regulated products.

---

[10] Prior to her reassignment as a Trainer in the Wealth Management division, Plaintiff worked as a customer-calling officer for the Wetumpka, Alabama market, a position within Colonial's retail banking operation.

Based on these undisputed facts, Linda Green found that Plaintiff Graham was not qualified for the position because of her lack of NASD licensing and her lack of sales and marketing experience regarding NASD regulated products:

> 25.    In evaluating Kitty Graham's future within Wealth Management, I was faced with the undeniable fact that she could not serve as a Wholesaler because she lacked NASD licensing and had no experience whatsoever regarding the sale and marketing of NASD regulated products. . . . Without proper licensing, Ms. Graham lacked an essential and necessary qualification for the Wholesaler position. Consequently, I concluded that she was not qualified to provide the necessary sales training and product support to Colonial's NASD licensed Financial Consultants.

*Id.* at ¶25.    Green, obviously realized the futility of promoting Plaintiff Graham to the Wholesaler position when she could not perform 35% of the duties which Colonial reasonably concluded were necessary to perform the job – a situation akin to hiring a paralegal to perform the functions of an attorney. A paralegal might be able to perform some attorney functions, but without a license to practice law or the extensive training and experience, her utility and productivity would be extremely limited because she could not perform essential functions of the job. That is precisely the case here. In sum, Plaintiff has failed to establish any alleged disparities in the relative qualifications of Cary Guffey, and certainly none of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.

In contrast, Cary Guffey had experience on both sides of the equation – insurance/fixed annuities and equities. His bona fides regarding his qualifications to market, sell and train others regarding NASD-licensed products are undisputed. At the time he was promoted to the Wholesaler position, Guffey had been marketing and selling NASD regulated products (stocks, bonds, mutual funds and variable annuities) as well as insurance and fixed annuities for a period

of five years, first as a broker at Merrill Lynch (August 1999 through July 2002), and later, as a Colonial Financial Consultant servicing a 12-branch territory from July 2002 through January 2005. C. Guffey Aff. (Doc. no. 17) at Ex. I, ¶¶ 4-6. In his capacity as a Financial Consultant, Guffey also provided sales training to Licensed Bankers in his sales territory regarding the sale of insurance and fixed annuities. *Id.* at 5.

Moreover, at the time of his promotion Guffey held a B.S. degree in Business Administration from the University of Florida, an MBA from Jacksonville State University, and several NASD licenses. *Id.* at ¶3. There is no evidence that Plaintiff Graham had any advanced degrees. Furthermore, unlike Graham, Guffey had successfully completed that NASD Series 7 Exam (General Securities Registered Representative) and the NASAA Series 66 Exam (Uniform Combined State Law Examination), both of which he held since 2000. *Id.* at ¶6. Successful completion of the Series 66 exam is equivalent to the successful completion of both the Series 63 (Uniform Securities Exam) and Series 65 (The Uniform Investment Advisor Law Examination). *Id.* Moreover, Guffey had been licensed by the State of Alabama to sell insurance and fixed annuity products since 2000. *Id.*

Thus, Guffey had a record of significant experience across the board regarding all types of investment products provided by Colonial to its customers. Furthermore, Guffey had provided training to Colonial Licensed Bankers regarding insurance and fixed annuities. In other words, he was ready to perform the duties of Wholesaler on day one. As stated by the decision maker, Wealth Management Director Linda Green:

> 26. . . . . At the time of his promotion, Mr. Guffey had worked for approximately 2½ years as a Financial Consultant in the Wealth Management division, where he worked with and trained Licensed Bankers in a 12-branch territory with respect to the sale of insurance and fixed annuities. Unlike Ms. Graham, however, at the time of his promotion, Mr. Guffey was licensed by the NASD

and, in fact, held Series 6, 7 and 63 NASD licenses. Additionally, before accepting employment with Colonial in July 2002, Mr. Guffey worked for three years as a broker for Merrill Lynch marketing and selling NASD licensed products. Thus, in addition to his experience in selling insurance and fixed annuities, Mr. Guffey had extensive experience selling stocks, mutual funds, bonds and other NASD regulated products. Mr. Guffey also has been licensed by the State of Alabama to sell insurance products since 1999 and, in fact, sold those products to Colonial customers in his capacity as a Financial Consultant. I also found that Mr. Guffey was well-respected among his peers and the various branches in his sales territory, and that he maintains a very professional deportment.

27.    In sum, I found that Mr. Guffey was qualified for the position and that he specifically was qualified to perform many job duties which Kitty Graham never performed as a Trainer and, in fact, could not perform without the requisite NASD licensing. Based on these factors, I chose to promote Mr. Guffey to one of the two new Wholesaler positions.

L. Green Aff. (Doc. no. 17) at Ex. A, ¶¶26-27.

Finally, as noted above, an employer is entitled to establish legitimate, non-discriminatory minimum qualifications for a position, *see, e.g., Kephart*, 630 F.2d at 1218 and *Coleman*, 1985 WL 350 at *4, and the Court may "not second-guess a company's legitimate assessment of whether an employee is qualified for a particular position." *Steger v. General Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003). In sum, Plaintiff has failed to show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Colonial's conclusion that Guffey was better qualified than Graham for the Wholesaler position such that a reasonable factfinder could find it unworthy of credence. *Combs*, 106 F.3d at 1538.

For this additional reason, Colonial is entitled to summary judgment on all of Plaintiff's claims.

**B.    PLAINTIFF GRAHAM HAS FAILED TO REBUT COLONIAL'S EVIDENCE THAT THE WEALTH MANAGEMENT DIVISION WAS UNPROFITABLE DUE, IN PART, TO HER ROLE IN THE POOR PERFORMANCE OF THE FAMILY INSURANCE SECTION.**

Plaintiff also has failed to rebut Colonial's second legitimate, nondiscriminatory reason for its decision to appoint Guffey rather than her to the Wholesaler position, *i.e.*, that the Wealth Management division was unprofitable due, in part, to her role in the poor performance of the Family Insurance section.    As set forth in great detail in the original affidavit of Wealth Management Director Linda Green, as well as in Colonial's original summary judgment brief, Colonial engaged the Huntington Investment Company in mid-2004 to serve as an outside consultant for a three-year period to review the structure of the division and to provide advice and recommendations for improving overall performance and profitability.    L. Green Aff. (Doc. no. 17) at Ex. A, ¶9.    As established by Green's affidavit, Huntington analyzed Colonial's investment and insurance program by comparing certain categories of its performance to industry performance benchmarks,[11] including deposit sales penetration, deposit revenue penetration, annual sales production and annual revenue production for NASD licensed Financial Consultants as well as Licensed Bankers (insurance license only).    The results of that analysis established that the Wealth Management Section was significantly underperforming both the industry average and the top quartile in every category.    The study also established other indicia of poor performance.    For example,

- Wealth Management was not meeting its internal goals in that none of the five sections of the Wealth Management division met their 2004 budgeted goals, and four of five sections, including the Fixed Annuity Platform Program, suffered a decrease in revenues in 2004, L. Green Aff. (Doc. no. 17) at Ex. A, ¶¶ 10-13;

---

[11] Contrary to Plaintiff's allegation, *see* Pl's Resp. Br. (Doc. no. 17) at 11, Colonial did not base its determination of profitability for the Wealth Management division merely on a comparison to Huntington's performance, but rather also relied upon a comparison of Colonial's performance with the industry average and the top quartile of the industry.    Green Aff. (Doc. no. 17) at Ex. A, ¶10; Colonial Sum. Judg. Br. (Doc. no. 17) at 8-9.

- fixed annuity sales in Alabama and Florida fell well-below the 2004 budgeted goal and, for Alabama, substantially decreased when compared to 2003 sales, *id.*; and

- the individual performance of Licensed Bankers was very poor in that in 2003 and 2004, respectively, only 48 of 325 and 45 of 354 Licensed Bankers met their sales goals, and 116 of the 325 and 103 of 354 Licensed Bankers sold no Family Insurance products.  *Id.*

L. Green Aff. (Doc. no. 17) at Ex. A, ¶¶ 10-13.   In sum, the financial picture for Wealth Management and, particularly the Family Insurance section, was bleak.  Based on the undisputed analysis by Huntington, Colonial reasonably concluded that Plaintiff, as well as other employees of the Family Insurance Section, simply were not getting the job done.[12]  Consequently, Colonial made a good faith, reasonable business judgment that, in addition to her lack of qualifications, Plaintiff would not be the best candidate for the Wholesaler position given the lackluster performance of the Family Insurance section in 2003 and 2004.[13]

In her Response Brief, Plaintiff clearly urges the Court to second-guess and substitute her judgment for the judgment of Colonial regarding the performance and profitability of the Family Insurance section.  In fact, rather than challenging the accuracy of the financial data prepared by Huntington and relied upon by Colonial, Plaintiff purports to establish the profitability of the Family Insurance section she managed by citing generalized performance data such as Colonial's rank in a single quarter among the top 50 bank holding companies and its rank among the top 25 banks in the South.  *See* Pl's. Resp. Br. (Doc. no. 22) at 10.

---

[12]  Although Colonial does not fault Plaintiff Graham for changing market conditions, it remains undisputed that, as the Platform Annuity Agent Trainer, she was partly responsible for the overall lackluster performance of her section and for the woeful performance of the Licensed Bankers.  In fact, Plaintiff does not dispute that her job description clearly assigns responsibility to "increase gross sales and fee income in the platform program."  Platform Annuity Agent Trainer Job Description (Doc. no. 17) at Ex. I.

[13]  As noted by the Fifth Circuit, "the ADEA does not require that an employer prove that it is in fact losing money before it can take a nondiscriminatory and legitimate course of action to make more."  *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 152 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 709 (1996).

Whether the undisputed evidence offered by Colonial regarding the Family Insurance section's lagging profitability or the generalized rankings offered by Plaintiff are the appropriate measure of the Family Insurance section's performance is not an issue for the Court or the factfinder to decide. *See, e.g.*, *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3rd Cir. 1998) ("whether sales quotas or evaluation scores are a more appropriate measure of a manager's performance is not for the court (or factfinder) to decide"). Even assuming, *arguendo*, that Plaintiff's data is the more accurate measure of the profitability of the Family Insurance section, such a determination is insufficient, as a matter of law, to establish pretext. As consistently held by the Eleventh Circuit, in the absence of evidence that the employer's decision is motivated by a discriminatory intent (here, age or gender), [t]he fact that the employer's belief may be mistaken or wrong in fact does not mean that such belief cannot constitute a legitimate reason for the employer's discharge of the plaintiff." *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449 (11th Cir. 1987); *see also Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by sex."); *Cf. Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1339 (11th Cir. 2000) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race."); *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996) ("Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action'") (internal citation omitted).[14] Here, Plaintiff has offered no evidence whatsoever that Colonial's assessment of the performance of the Family Insurance section was a lie or phony or

---

[14] *See also e.g., Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (summary judgment appropriate where employee was discharged because employer "honestly believed" she had fraudulently accepted disability benefits and she was unable to point to facts suggesting she was investigated differently because she was an older employee); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) ("An articulated motivated reason is not converted into pretext merely because, with benefit of hindsight, it turned out to be poor business judgment."). Clearly, Plaintiff has failed to meet this weighty burden.

that Colonial's decision in appointing Guffey rather than Plaintiff as the Wholesaler was motivated by age or gender.

Furthermore, even assuming the relevancy of her alternative analysis, the evidence Plaintiff offers does not, in fact, establish an increase of net profits (or even gross revenues) for the Family Insurance section in 2004 or otherwise show improved performance. For example, Plaintiff contends her success as a Wholesaler in the Family Insurance section is evidenced by the fact that Colonial was ranked among the top 50 banks in the country and the top 25 in the South for sales of annuities and mutual funds during the first quarter of 2004. Pl's. Resp. Br. (Doc. no. 22) at 10-11. Colonial does not dispute these rankings to the extent that they are even relevant. However, on their face, the rankings, which are merely a snapshot of Colonial's performance in a single quarter, are not based on revenues generated solely from the sale of insurance and fixed annuities, *i.e.*, the area of Plaintiff's responsibility as a Trainer. Rather, those rankings are based on revenues generated from sales of mutual funds and annuities (fixed ***and*** variable). Given the undisputed fact that the Family Insurance section was not responsible for the sale of variable annuities or mutual funds (both of which are NASD regulated products), Plaintiff's comparison is misleading at best, and reveals nothing about the specific performance of the Family Insurance section. In other words, Plaintiff's attempt to correlate these rankings with the performance of the Family Insurance section is truly an apples and oranges comparison. The rankings are also misleading because a bank, such as Colonial, can have a relatively high rank, yet still have unprofitable sections therein or sections that are profitable for a single quarter but which are not profitable over the course of a year. In fact, as established by Plaintiff's evidence, although Colonial is listed in the top 50 banks in the country regarding revenues generated from annuity and mutual fund sales for the first quarter of 2004, the very chart cited by

Plaintiff clearly reflects that Colonial's annuity and mutual fund ***revenues actually decreased 19%*** from the previous quarter.  Singer Annuity and Funds Report (Doc. no. 23) at Ex K, 4.

Furthermore, Plaintiff's analysis does not rebut the analysis prepared by Huntington and relied upon by Colonial as a basis for its restructuring plan – data specifically focused on determining the performance and profitability of the Family Insurance section.  For example, Plaintiff does not rebut Colonial's evidence that revenues generated from fixed annuity sales for 2004 failed to meet budgeted goals and even reflected a significant decrease from 2003 revenues.  Plaintiff also cannot rebut Colonial's evidence that the sales of insurance and fixed annuities by Licensed Bankers for 2003 and 2004 (for which she was responsible, in part, for training and motivating) were woefully inadequate, with almost a third of the 300-plus Licensed Bankers selling ***no*** insurance or fixed annuities in either year.  L. Green Aff. (Doc. no. 17) at Ex. A, ¶¶10-13.

Finally, the numbers Plaintiff cites in her "Income Before Taxes and Management Fees" chart, a chart which purports to reflect ***gross*** revenues rather than net profits, reflects a substantial ***decrease*** of $507,466.00 in gross revenues (or 9.3 percent) for the Family Insurance section in 2004.  Pl's. Resp. Br. (Doc. no. 22) at 12.  .  In other words, although Plaintiff may be able to establish a 3% increase in the Family Insurance section's percentage-share of the total gross revenues generated by the Wealth Management division in 2004, that increase does not tell the complete story -- that the Family Insurance section actually suffered nearly ***a 10% decrease*** (a half-million dollar loss) in 2004.  In sum, the Court should reject Plaintiff's invitation to second-guess the basis of Colonial's decision.  *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.' ") (citations omitted).

For this additional reason, Colonial is entitled to summary judgment on all of Plaintiff's claims.

## C.    PLAINTIFF GRAHAM HAS FAILED TO REBUT COLONIAL'S EVIDENCE THAT SHE WAS UNQUALIFIED FOR THE WHOLESALER POSITION.

Plaintiff's failure to establish her qualifications for the Wholesaler position not only supports Colonial's argument regarding her failure to sustain a *prima facie* case for any of her claims, but also, her lack of qualifications alternatively provides a third and final basis of Colonial's legitimate, nondiscriminatory reasons for selecting Cary Guffey rather than Plaintiff for the Wholesaler position.  Accordingly, Colonial incorporates herein its previous argument regarding Plaintiff's lack of objective qualifications for the Wholesaler position.  Furthermore, because Plaintiff has failed to show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Colonial's proffered legitimate reason for appointing Guffey rather than Plaintiff to the Wholesaler position that a reasonable factfinder could find it unworthy of credence, *see Combs*, 106 F.3d at 1538, Colonial is entitled to summary judgment on all of Plaintiff's claims even if the Court rejects Colonial's other two proffered reasons for its decision.

## PART III – PLAINTIFF HAS FAILED TO SUBMIT EVIDENCE OF DISCRIMINATORY INTENT.

Finally, Defendant Colonial is entitled to summary judgment on all of Plaintiff's claims because she has failed to produce any evidence by which a finder of fact could reasonably conclude that Colonial intended to discriminate against her on the basis of age or gender.  It is well-established that in addition to establishing pretext and, in particular, showing that Colonial's reasons for selecting Guffey over Plaintiff for the Wholesaler position were false, Plaintiff Graham must also establish that discrimination was the real reason.  *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993); *see also Rowell v. Bellsouth Corp.*, 433 F.3d 794, 798 (11th Cir. 2005) (under the ADEA, where there has been a reduction-in-force, the plaintiff must

present evidence by which a factfinder could reasonably conclude that the employer intended to discriminate on the basis of age in reaching that decision); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1329. In the instant case, other that conclusory allegations, Plaintiff has offered no evidence of discriminatory intent by Colonial, whether based on age or gender.

Furthermore, in addition to the evidence submitted in support of its nondiscriminatory reasons, Colonial also submitted other undisputed evidence establishing that its motives for selecting Guffey instead of Plaintiff were not motivated either by Plaintiff's age or her gender. In particular, Colonial established the following facts:

- There is no direct evidence of any discriminatory intent, *e.g.*, comments about Plaintiff's age or gender or about the age or gender of any other Colonial employee;

- The major decision maker, Wealth Management Director Linda Green, was a member of the protected class (female over 40) as were numerous other high-ranking Colonial officials, *see* T. Gibson Aff. (Doc. no. 17 at Ex. C, ¶11[15]; and

- 21 of the 29 positions eliminated through the reorganization of the Wealth Management division were held by employees under the age of 40, and 16 of those 21 employees (including five men) were under the age of 30. *Id.*

All of these facts, which stand unrebutted, counter any conclusory allegation by Plaintiff that Linda Green's decision to select Cary Guffey rather than her for the Wholesaler position was motivated either by Plaintiff's age or her gender.

Accordingly, because Plaintiff has failed to present evidence by which a factfinder could reasonably conclude that Colonial intended to discriminate on the basis of age or gender in reaching that decision, Colonial is entitled to summary judgment on all of Plaintiff's claims.

---

[15] Plaintiff seeks to ignore the importance of the fact that the actual decision maker in this case was a member of the protected class. Although that fact alone may not be dispositive, the Eleventh Circuit unequivocally has held that it is an important factor courts should consider and that a plaintiff bears a more difficult burden to establish discriminatory intent when the primary players behind the decision are well over forty and within the protected class of persons protected by the ADEA. *See, e.g. Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991).

## III.    CONCLUSION

For the foregoing reasons, as well as those set forth in Colonial's previously submitted summary judgment brief, the Court should enter summary judgment in Colonial's favor as to all counts against it contained in the Complaint, dismiss the Complaint and all claims in this lawsuit against Colonial with prejudice, and tax costs against Plaintiff.

Respectfully submitted,

/s/Christopher W. Weller
Christopher W. Weller (WEL030)
**CAPELL & HOWARD, P. C.**
P.O. Box 2069
Montgomery, Alabama 36102-2069
(334) 241-8000

**THE COLONIAL BANCGROUP, INC. &
COLONIAL BANK, N.A.**
David B. Byrne, Jr. (ASB-0354-R69D)
General Counsel
One Commerce Street
Montgomery, Alabama 36104

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon counsel of record *via* U.S. Mail:

Susan Graham, Pro Se
974 Lewis Road
Deatsville, Alabama 36002

DONE this the 6th day of October, 2006.

/s/Christopher W. Weller
Of Counsel

# EXHIBIT M

### AFFIDAVIT OF ROBERT E. LOWDER

STATE OF ALABAMA )
)
MONTGOMERY COUNTY )

Before me, a notary public in and for said state and county, personally appeared Robert E. Lowder, who, after being first duly sworn, deposes and says as follows:

1.    My name is Robert E. Lowder.  I am a resident of Alabama.  I am currently the Chairman and Chief Executive Officer of Colonial BancGroup and, in such capacity, file this Affidavit in support of Colonial's motion seeking summary judgment in the lawsuits filed by former Family Insurance Manager, Susan Guy, and former Platform Annuity Agent Trainer, Kitty Graham.  Both Ms. Graham and Ms. Guy were employed by Colonial Bank in its Wealth Management division until their positions were eliminated in January 2005 pursuant to a reorganization of the division.

2.    I am authorized to make this affidavit, and I am competent to testify at trial regarding the statements made in this affidavit.

3.    In May 2004, I hired Linda Green as the new Executive Vice President of the Wealth Management division of Colonial Bank, N.A.  The job description for the Director position included minimum qualifications requiring candidates to hold certain NASD licenses. When I discussed the position with Ms. Green, she informed me that she did not hold the requisite licenses at that time, but we agreed that she could obtain those licenses after her appointment to the Director position.

4.    Weighing all of Ms. Green's relative qualifications, I agreed to waive the NASD license requirement based on the following factors:  my knowledge of the duties and functions of the Director position; my personal knowledge and experience regarding Ms. Green's past

1

performance as President/CEO-Huntsville Region of Colonial Bank, N.A. and, in particular, her management skills and success in implementing sales programs and accountability; my considered opinion that she was highly qualified to perform the functions of the Director position and the best candidate to effectively serve the interest of the Company; and my conclusion that possession of the NASD licenses was not immediately necessary for her to successfully perform the job.

5.      Immediately after her appointment as Director, Ms. Green was diagnosed with breast cancer and underwent a bilateral double mastectomy in June 2005, followed by six months of chemotherapy treatment. Even while undergoing chemotherapy, Ms. Green prepared for her Series 7 examination. She ultimately obtained her Series 7, 24 and 63 licenses in March, July and December of 2005, respectively.

**FURTHER THE AFFIANT SAYETH NOT.**

Robert E. Lowder

**SWORN TO AND SUBSCRIBED BEFORE ME** on this the 5TH day of October 2006.

(SEAL)

Notary Public

My Commission Expires: __2009__

2

# EXHIBIT N

## SUPPLEMENTAL AFFIDAVIT OF LINDA GREEN

STATE OF ALABAMA    )
                         )

MADISON COUNTY    )

       Before me, a notary public in and for said state and county, personally appeared Linda Green, who, after being first duly sworn, deposes and says as follows:

       1.      My name is Linda Green. I am a resident of Alabama. I am currently employed as Executive Vice President of the Wealth Management division of Colonial Bank, N.A. and, in such capacity, file this Supplemental Affidavit in support of Colonial's motion seeking summary judgment in the lawsuits filed by Kitty Graham and Susan Guy, former employees of the Wealth Management division.

       2.      I am authorized to make this affidavit, and I am competent to testify at trial regarding the statements made in this affidavit.

       3.      In her summary judgment Response Brief, Plaintiff Susan Guy expresses confusion regarding Sean Tesoro's proper job title. Although as Director of the Wealth Management division I originally announced on January 18, 2005 that Sean Tesoro had been appointed as "Sales and Service Manager," his title was later changed to "Program Director" to better reflect the functions of the position. The qualifications of and duties assigned to the position, however, have remained the same since Mr. Tesoro's appointment to the position. This title change was made after the elimination of Ms. Guy's position as Family Insurance Manager.

       4.      Furthermore, contrary to the statements made by both Susan Guy and Kitty Graham in summary judgment response briefs, the January 18, 2005 memorandum announcing the appointment of Sean Tesoro and Cary Guffey to their newly-created positions did not serve as a formal job description for either the Program Director (or Sales & Service Manager) or the

Regional Sales & Development Wholesaler positions. Rather, this interoffice memorandum was merely an announcement I provided to members of the managerial staff of Wealth Management and Bank Management announcing the new organizational structure of the division and generally describing the functions of the newly-created positions held by Messrs. Tesoro and Guffey.

5.     Although discussed in detail in my first affidavit, prior to the creation of the Program Director position held by Mr. Tesoro, most of the NASD-related duties were assigned to the Product Manager position in the Program Management section of the Wealth Management division. Those former duties, in addition to the insurance and fixed annuity related duties of the former Family Insurance Manager position, have been consolidated into the single Program Director position held by Sean Tesoro. Furthermore, the majority of Mr. Tesoro's duties as Program Director involve functions related to NASD regulated products.

6.     Finally, with respect to my promotion to the position of Director of Wealth Management in May 2004, although it is true that I did not hold any NASD licenses at the time of my appointment, I advised Chairman and Chief Executive Officer Robert Lowder of that fact during my interview. Mr. Lowder concluded, however, that I was qualified to perform the duties of the Director position based on my management skills and my success in establishing sales programs with appropriate accountabilities in my capacity as President/CEO of the Northern Region of Colonial Bank, N.A. (which included 11 counties and 33 bank branches). Moreover, Mr. Lowder concluded that it was not immediately necessary for me to hold those licenses to successfully perform the job. We further agreed that upon my appointment to the Director position, I would undertake the necessary steps to obtain the requisite securities licenses.

7.     Immediately preceding my appointment to the Director position I was diagnosed with breast cancer and underwent a bilateral mastectomy in June 2005 as well as six months of

chemotherapy treatment following my surgery. Even while I was undergoing chemotherapy treatment, I began to prepare for the Series 7 examination in December 2004. I successfully completed the Series 7 examination in March 2005, the Series 24 examination in July 2005, and the Series 63 examination in December 2005.

**FURTHER THE AFFIANT SAYETH NOT.**

*Linda Green*

Linda Green

**SWORN TO AND SUBSCRIBED BEFORE ME** on this the 5th day of October 2006.

(SEAL)



Notary Public

My Commission Expires: _____

DONNA E. WEINBERG
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
MY COMMISSION EXPIRES 08/30/2013