# EXHIBIT B

LookSmart

FindArticles > Southern Business Review > Spring 2004 > Article > Print friendly

**Workforce Reduction Guidelines**

Simone, Andrew

Now, more than ever, companies are taking part in workforce reductions. Workforce reduction can go by many names- reduction in force, downsizing, rightsizing, eliminating redundancy, lay-offs, cutting staff, or reengineering. Most people would choose to blame the poor condition of the U.S. economy. While this may be true in some cases, organizations undertake lay-offs for many different reasons. No matter what an organization chooses to call it, this objective can be accomplished in either effective or ineffective ways.

Lay-offs of a significant proportion generally suggest a considerable reduction in business. Usually, it is prudent to search for any other alternatives available before proceeding with a workforce reduction. If a workforce reduction is deemed the only course of action capable of meeting an organization's objectives, thorough planning, organization, and implementation need to be prearranged before any action is taken. The consequences of an ineffective workforce reduction strategy can be devastating.

Reasons Companies Need Workforce Reductions

The decision to undertake a workforce reduction is not made lightly. Companies require reductions in the workforce for many reasons including poor economic environment, technology making functions obsolete, foreign competition, slumping sales, mergers, plant closures, bankruptcy, or even over-staffing.

To explore just one example, when the technology revolution began back in the 1980's, many jobs were eliminated by technological advancements in information technology (IT); however, by 1997, a Harvard study of 250 insurance companies noted that IT improvements that automated low-level job functions in the industry might have finally run their course (Leibs & Carrillo, 1997: 7). This demonstrates the unpredictability that technology places upon workforce makeup.

Organizations can hope to achieve several goals through a workforce reduction. These include increasing efficiency, improving customer service, improving quality, increasing profitability, as well as reducing costs and eliminating unproductive positions. Gaining an edge on the competition may be achieved with the right realignment of a workforce.

Importance of Doing It Correctly and Avoiding Common Mistakes

Many companies have learned through experience that downsizing is a process loaded with potential litigation. Government statutes supply employees with various methods of legal retribution. Any suit filed, regardless of its legitimacy, will create financial burdens for an employer. Obtaining qualified legal counsel, paying for the case preparation, filing motions, depositions, etc., are unavoidable expenditures whose costs must be considered. Sensible employers are aware of the frequency of litigation and take steps to minimize the liability. Without following careful steps to workforce reduction, businesses often fall short of their original objectives. One study showed that "two-thirds of the downsized organizations experience no increase in productivity and 50 percent see no improvement in profits" (Jane, 1997: 1).

Evaluating overall worker contributions and employee notification are multifaceted, legal, and, frequently, emotional processes for any organization. Short-term savings may be recognized through lay-offs, but any large-scale reduction in the workforce involves hidden costs from issues such as discrimination claims, class action suits, and wrongful discharge lawsuits. When economic conditions improve and growth returns, replacing employees who were laid-off can also prove to be difficult and costly.

One common mistake businesses make in reducing their workforces is to cut administrators and managers without reducing

professional staff. A Harvard study of 250 insurance companies showed that

[c]ompanies that do better (in reducing workforce) first scrutinize their professional staffs closely (Leibs & Carrillo, 1997: 2).

It is important to restructure the entire workforce of an organization to provide consistency with the corporate vision. Lay-offs should not be tactical but instead strategic. The makeup of a workforce after the reduction is critical for its success.

Other common mistakes identified when interviewing local executives include cutting too many employees, choosing the wrong employees to cut, poor timing, and a bad decision-making process. Surprisingly, the biggest mistake mentioned by executives was allowing emotions to get involved.

Steps of an Effective Workforce Reduction

The following steps are designed to minimize potential legal and financial ramifications. Failure to take extreme precaution will likely result in an unsuccessful workforce reduction.

Identifying the Reasons the Workforce Reduction Is Necessary

The business justification for a reduction in workforce should be put in writing. In doing this, employers can show evidence that all alternatives were considered, which can be extremely beneficial in demonstrating to a jury that only business reasons were relevant in the decision-making process. Alternatives to be considered include hiring or wage freezes; allowing for natural attrition; creating early retirement incentives; eliminating temporary workers; reducing hours, pay rates, or fringe benefits; or making employee transfers. Businesses can save money using any of these techniques, and an effort should be made to fully evaluate the potential savings of such actions. Human resources executives Carie Bennett of Velocitel, Inc., and Naomi Buenaflor of Young's Market Company, Inc., both stated that the first step in the process is to "identify future needs" (Bennett 2002:1 & Buenaflor 2002: 1).

Evaluate Policy or Practice for Terminations and Reductions

While many companies do not have written procedures and policies, past practices and policies should be reviewed to determine if they apply to workforce reduction. Previous severance packages and the length of notice given to employees can be deemed as precedent. What was given in the past must be evaluated because employees who are laid-off may be entitled to the same benefits in addition to any special severance.

Determining the Scope of the Reduction

Employers must determine if the downsizing will involve individual departments, business units, or the entire company. Closing a facility or location during a lay-off presents some additional issues to be addressed. The timing should be determined, as well as the key personnel involved in implementing the workforce reduction.

Selecting Employees to be Discharged

Using objective measures to determine which employees will be laid-off is critical. Some criteria to be considered are seniority, elimination of functions, bargaining vs. non-bargaining employees, measured quantity of production, performance, and skill-level. Seniority and elimination of job functions are the most objective measures. Terminating employees based on performance without written documentation of evaluations will likely result in wrongful termination or discrimination suits. Written criteria outlining the decision-making process will avoid or minimize subjectivity. The primary objective is to be left with the best-qualified workforce after a reduction in force.

Studying the Workforce Profile

Discrimination claims against employers are usually related to age, sex, or race. Employers should have statistics showing the percentage makeup of the workforce before and after a reduction is undertaken. These data can be used to demonstrate that no statistically significant impact affected a particular protected class of employees. This analysis should be completed before any final decisions are made.

Weighing the Potential Costs

One of the main goals of most reductions in force is to decrease costs, but completing a workforce reduction usually results in a short-term increase. Litigation costs, attorneys' fees, severance pay, unemployment claims, and decreased productivity from remaining employees are likely to result. Analyzing the effects of these issues should be done in advance to determine whether a lay-off would actually achieve the objective of reducing costs.

Determining Contractual Commitments

Employers with collective-bargaining agreements are usually required to perform systematic lay-offs based on some criteria, such as seniority. Naomi Buenaflor, senior vice president of human resources at Young's Market Co., refers to this as "effects bargaining" (Buenaflor, 2002). In this example, union contracts spell out the reduction protocol from the union's negotiations with employees chosen by either seniority or qualifications. Other contract criteria may require that lay-offs first be on a voluntary basis or require a reduction in hours for all employees before reducing the workforce. Ms. Buenaflor warns that "bargaining employees must be evaluated strictly by the terms of the written contract or legal action will most assuredly follow" (Buenaflor, 2002).

Considering Employees with Lengthy Service or on Leave

Employees who have a long service record with a company tend to be very sympathetic litigants and are the most likely employees to file wrongful termination or discrimination lawsuits. Special consideration should be given to these employees because their attachment to an organization is stronger than a newer employee.

Legal counsel should be consulted regarding employees on worker's compensation, disability, family, or medical leave. Including these employees in a reduction should be carefully managed to limit exposure to legal claims.

Considering Legal Statutes/ Issues

Worker Adjustment Retraining and Notification Act (WARN) requirements apply to employers with 100 or more employees. In the case of a mass lay-off or plant closing, 60 days notification is required. A mass lay-off is a reduction of at least 33 percent of the employees but not less than 50 total employees at a single site. A plant closing is a shutdown of a single site, or one or more operating units at a site, resulting in a reduction of 50 or more employees. These calculations include the previous 30 to 90 days, so any recent prior reductions need to be included.

The Older Workers Benefit Protection Act (OWBPA) concerns older employees. To obtain a release of claims from an employee more than 40 years of age, special requirements must be met. First, the release must be clearly written and must specifically make mention of the employee's rights under the Age Discrimination in Employment Act (ADEA) that are being waived. Next, the release must be in exchange for something of more value than the employee is already entitled. For example, if two weeks severance is being given to each employee in the reduction, something additional must be given to employees covered under OWBPA. The employer must advise these employees to seek legal counsel before signing the agreement. The release must also allow for a seven-day period in which the employee may revoke the agreement after it is signed. In addition, employees must be given between 21 and 45 days to consider the release agreement.

Employee Retirement Income security Act (ERISA), section 510 is another legal challenge that must be considered. It prevents employers from terminating an employee to prevent vesting of benefits offered in the company's plan.

In 1993, the United States Supreme Court held that an employer does not necessarily violate the ADEA by interfering with an older employee's pension benefits where vesting rights were determined not by age but by the employee's years of service (Erwin, Macaulay and Stuckey, 1999: 6).

Therefore, if vesting is determined by age, older employees may be protected.

Creating a Termination Checklist

A checklist is helpful to managers who are not experienced in undergoing lay-offs. Being in a position to discharge a large number of subordinates can be very difficult for a supervisor. The checklist can also be beneficial to human resources professionals who are handling a large volume of lay-offs. Items on the checklist can include vacation due and owed, Consolidated Omnibus Budget Reconciliation Act (COBRA) information, money due from the employee, equipment the employee has outstanding, and required state pamphlets regarding unemployment.

Developing a Severance Package in Exchange for a Release

Businesses must determine if severance pay will be given. If a company has undergone previous workforce reductions, severance pay from those should be reviewed. If severance pay will be given, the employer should prepare with legal counsel a severance policy that limits it to this particular lay-off. This allows companies to make independent decisions for future reductions. It also limits future employees from receiving severance pay should the company decide it would not be including a severance package. Having departing employees sign a written release in exchange for severance pay dramatically helps to protect the business from future litigation. Items offered in a severance package can include severance pay, company paid COBRA, transitional funds, retraining, outplacement counseling, and unemployment information.

Preparing a Separation Letter

Every employee who is impacted should be given a separation letter. This letter should impart the company's regret that the current conditions make the workforce reduction necessary but should not mention any criteria used in selecting employees. The letter should also inform the employee that his or her final paycheck, severance pay, and accrued vacation are all being paid at that time. A description of all benefits available, including COBRA, should be covered in the separation letter, as well as details regarding stock options and 401k vesting. Also necessary is a statement that no other compensation or benefits will be provided except what is covered in the letter and that the employee has no rights regarding being recalled. Employees should also be reminded of their obligations under any non-disclosure or confidentiality agreements previously made. Finally, any transition assistance programs should be outlined, if available. By including each of these issues in the letter, little ambiguity will arise in the future, and the company can protect itself from as much litigation as possible.

Developing a Script

Instructions are usually helpful to managers involved in laying-off a number of employees. Providing a script may lessen the stress and difficulty for managers who are at a loss for words and can also help shield the company from managers making statements that could later be used in a court of law. It is important that these instructions include suggestions such as not belittling the departing employee or using negative attitudes in termination interviews.

Undertaking a Voluntary Reduction

One method of minimizing the legal exposure and difficult decision-making process is offering employees a voluntary severance package. Early retirement incentive plans are one method of accomplishing this. Employees close to retirement may welcome early retirement, provided they receive some additional severance benefits to which they are not yet entitled. Another method is offering packages for employees to take voluntarily. These packages are more generous than what the employee would otherwise receive if he or she were involuntarily downsized. The reason both of these plans are beneficial to the

company is because, since they are voluntary, they greatly reduce any chance of claims being filed. Written releases should be signed in exchange for the severance packages being offered.

Completing Termination Interviews

A company should begin termination meetings by informing the employee of the company's decision and of the decision's finality. Next, the company outlines what the employee can expect to happen over the following week and explains the employee's rights while allowing him or her to respond and let out his or her frustration. The separation letter is discussed with the employee, and any questions the employee may have are answered while protecting the company's interests. By offering laid-off employees as much as possible, the company will benefit from survivors' morale and keeping the company's reputation intact. Because employees may have outbursts when informed of the company's decision, having a third person in the room and ensuring that an exit is nearby are both advisable. If a company suspects that an employee may become violent, it is necessary to notify the police of the situation beforehand. Being terminated can be very embarrassing for an employee, so offering the person an alternative time to pick up his or her belongings when the office is empty is a considerate option. If the terminated employee decides to gather his or her belongings, the employer should give him or her a time limit and escort him or her to gather his or her things and say goodbye to co-workers.

Implementing Survivor Plans

The poorly executed workforce reduction's biggest impact may be on the surviving employees. seeing friends and co-workers leave is very difficult. If remaining employees feel the company did not treat them well or handled the situation poorly, their future performance and willingness to rise to the occasion may be compromised. A great deal of effort goes into a downsizing, but even more effort needs to be invested in the employees who remain. The goal should be to boost morale despite the loss, minimize damage to trust, aid renewal, and fuel increased productivity. Leadership is critical at this time, and top executives should be visible and open to communication. A company memo from the president with a positive tone is often used to boost morale once the reduction is complete. Carie Bennett, vice president of human resources at Velocitel, Inc., suggests "discouraging the leaders from hiding in their offices in the days following a reduction" (Bennett, 2002).

Managers should meet with survivors individually to demonstrate their value to the company and their contribution to the workplace. Because their trust in the organization may be damaged, it is necessary to reassure remaining employees of their job security and their future with the organization. Common reactions by survivors may include fears related to learning a new job or an increasing workload with more responsibilities, as well as feelings of victimization. Some employees find this exciting, while others find it difficult, and so it is important to recognize this time period as a transitional phase.

Thinking creatively after a workforce reduction is very important for managers. It is important for companies to streamline or eliminate as many non-value-added activities as possible. Ensuring that employees are focused on achieving the company's objectives is the most important corporate goal. Because employees may be feeling depleted, it is important that companies focus on making them feel that they are valued contributors. Career development discussions are invaluable during these times. Discussion of training and resources that remaining staff members need to excel should be encouraged, enabling them to feel confident and capable of great things.

In conclusion, following the recommendations outlined will greatly improve the effectiveness of any organizations' workforce reduction. While individual cases vary, the laws and statues that companies are most concerned about are almost universal. Emotions play an important role and may be the most difficult obstacle for management to overcome in downsizing, but every effort should be made to make terminations as smooth as possible. Using this practical guide to workforce reduction will limit liability and result in meeting the objectives set forth by the reduction.

References

Bennett, C. (2002). Personal interview conducted by the author. Velocitel, Inc. Irvine, CA.

Buenaflor, N. (2002). Personal interview conducted by the author. Young's Market Company, Inc. Orange, CA.

Heathfield, S. (2001). Downsizing survivors. [On-line]. Available: http://humanresources.about.com/library/weekly/aa011401.html.

Jane, W. H. (1997). Shifting the paradigm: A managerial plan of effective downsizing. ERIC Clearing-house on Counseling and Student Services, Greensboro, NC. [On-line]. Available: http://idcl.uncg.edu/ft.040300-01.html.

Leibs, S. & Carrillo, K. (1997). Harvard study: Downsizing only saves if done right. Information Week, [On-line]. Available: http://www.techweb.com/wire/news/1997.

Andrew Simone is senior financial analyst at Young's Market Company, Orange CA 92834.

Brian H. Kleiner is professor of human resource management, Department of Management, College of Business and Economics California State University, Fullerton, Fullerton, CA 92834.

Copyright College of Business Administration, Georgia Southern College Spring 2004
Provided by ProQuest Information and Learning Company. All rights Reserved